## COUNTY-SEAT OF LINN COUNTY.

1. COUNTY-SEAT ELECTION; *Jurisdiction of Commissioners; Limit to Inquiry.*   Where a petition for the relocation of a county-seat has been presented to the county commissioners, and acted on by them, an election ordered, two elections had, the votes canvassed, and the place receiving the majority of the votes at the second election declared the county-seat, the courts, under the amendment of 1872 to the contest act, will not inquire into the sufficiency of the petition, and hear testimony to show that some of the names thereon were improperly there, and that therefore it did not contain the requisite number of petitioners.

2. CONSTRUCTION OF STATUTES; *Legislative Use of Words.* Whenever a legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense, unless there be something in the context or the nature of things to indicate that it intended a different meaning thereby.

3. CONSENT OF ELECTORS — *How Ascertained.* Where the legislature has provided an "election" as the means of ascertaining the wishes of the electors of a county in reference to a change of the county-seat, and this question is the only one submitted to a vote, and has made no provision for a registration, and has designated no other list or roll as the evidence of the number of electors, it may provide that the place receiving a majority of the votes cast shall become the county-seat, notwithstanding the clause in the constitution, article 9, § 1, which reads, that "no county-seat shall be changed without the consent of a majority of the electors of the county."

4. ———— In such case the courts will not go behind the number of votes cast and inquire whether, as a matter of fact, all legal electors voted, or whether those not voting consented to the change.

5. ———— While a legislature may not by the mere machinery of rules of evidence, override and set at naught the restrictions of the constitution, or arbitrarily make conclusive evidence of a fact anything which in the nature of things has no connection with that fact nor reasonably tend to prove it, yet it may make that which, according to the ordinary rules of human experience reasonably tends to prove a fact, conclusive evidence of it.

6. REGISTRATION LIST — *Assessment-Rolls.* The "assessment-rolls" specified in § 4 of the county-seat act, are not the registration lists of adults authorized in chapter 86 of the General Statutes.

## Original Proceedings in Mandamus.

ON the 7th of September 1875, *Fred. Wagner*, mayor of the city of Pleasanton, as relator, filed in this court his affidavit for a writ of mandamus to compel certain county officers of Linn county to remove their offices from Mound City to the city of Pleasanton. An alternative writ of mandamus was allowed and issued, the style of the action being, *"The State of Kansas, upon the relation of Fred. Wagner, plaintiff, against M. E. Woodford, and others, defendants."* Said writ is as follows:

STATE OF KANSAS, COUNTY OF SHAWNEE, SS:

The State of Kansas to *M. E. Woodford, William Worden,*

and *W. H. Shattuck*, as county commissioners of the county of Linn, *F. J. Weatherbie* as county clerk, *Ed. R. Smith* as clerk of the district court, and *A. G. Seaman* as treasurer of said county, Greeting:

WHEREAS, it appears by the affidavit of *Fred. Wagner*, as relator, that said relator resides in and is the mayor of the city of Pleasanton, in the said county of Linn, and is the owner of real and personal property in said city, and a tax-payer and legal elector thereof; that at an election duly called and held in the several election precincts of said county of Linn, on the 14th of April 1874, for the purpose of relocating the county-seat of said county—the result of which was duly proclaimed by the board of county commissioners on the 18th of April 1874—the county-seat of said county was duly and legally located and established at said city of Pleasanton; that from that time said city of Pleasanton has been and still is the legal county-seat of said Linn county; that upon the proclamation of said result as aforesaid, all the county offices of said county, and all the books, records, and property belonging and pertaining to said county offices respectively, were removed to said city of Pleasanton, and there kept and maintained, and all the public business of said county required to be done and transacted at the county-seat was done and transacted at said city of Pleasanton, at which place also the several terms of the district court of said county were held, until about the 13th of March 1875, when you, the said *M. E. Woodford, Wm. Worden*, and *W. H. Shattuck*, constituting and acting as the board of county commissioners of said Linn county, unlawfully ordered and directed the removal of said county offices, and the books, records and property belonging and pertaining to said offices, from said city of Pleasanton to a place called Mound City, situate about seven miles from said county-seat, and that thereupon you the said *F. J. Weatherbie*, county clerk, *Ed. R. Smith*, clerk of the district court, and *A. G. Seaman*, county treasurer, unlawfully and wrongfully removed your respective offices, and the books, records and papers thereof, and property pertaining thereto, from said county-seat to said Mound City, and from that time you the said *F. J. Weatherbie*, county clerk, *Ed. R. Smith*, clerk of the district court, and *A. G. Seaman*, county treasurer, have kept and held, and still keep and hold, your respective offices as such county officers, and have been and still are transacting public and official business as such officers at said Mound City, in violation of the

statutes of this state, and of your official duty, and to the great inconvenience of said relator, and of the whole people of the county having public business to transact at the county-seat; and that you the said *M. E. Woodford, Wm. Worden,* and *W. H. Shattuck,* county commissioners as aforesaid, have held and still hold your sessions as the board of county commissioners of said Linn county at the place kept by said *F. J. Weatherbie* as the office of county clerk in said Mound City, in violation of law and your official duty, and in contempt of the wishes and interests of said relator, and of the whole people of said county:

*And whereas,* it is in and by said affidavit further alleged and shown, that, since the location of the county-seat of said Linn county at the city of Pleasanton as aforesaid, three-fifths of the electors of said county have not petitioned the board of county commissioners of said county for a relocation nor for a removal of said county-seat, and that a majority of the legal electors of said county have not consented, by election, or in any other manner, to any change of said county-seat from said city of Pleasanton; that an official registration of the male adults of said county of Linn, twenty-one years of age and upward, was made by the assessors of said county in the year 1874, as required by law, and filed in the office of the county clerk; that the whole number of such male adults, as returned by said assessors on the assessment-rolls of the several townships, was 3042, and that the whole number of legal electors in said county for all purposes connected with the ordering, holding, and determining the result of a county-seat election, in the months of January, February, and March 1875, was 3042: *And whereas,* it is further alleged and shown by said affidavit that the only petition presented to the board of county commissioners of said county for an election to relocate or to remove the county-seat of said county, since its location at Pleasanton as aforesaid, was presented to said board on the 19th of January 1875; that said petition was not signed nor authorized by three-fifths, nor by a majority of the legal voters of said county; that the said petition, upon which the pretended election hereinafter mentioned was held, purported to be signed by 1964 persons, and the names subscribed thereto (numbering in all 1964) were claimed by the persons who presented said petition to be the names of legal electors of said county; that in truth and in fact the said petition was composed of 52 separate sheets of paper, part with written

and part with printed headings, fastened together with paper fasteners; that 12 of said sheets, containing 311 of said 1964 names, were parts of an old petition circulated in the spring of 1874 by persons in favor of locating the county-seat at the center of said county, and by them abandoned more than six months before the remaining sheets of said petition (which were circulated by the friends of Mound City) were used or circulated; that said 12 sheets were fraudulently attached to and presented with the other sheets of said petition to said board; that, in addition to said 311 names so fraudulently attached as aforesaid to said petition, 262 of the names appearing thereon were wholly fraudulent, and did not represent the name of any legal elector or electors of said county; that 82 other names appearing on said petition were the names of persons who were at the time said petition was circulated and presented, and still are, nonresidents of said Linn county; that 31 other names appearing on said petition were names of persons residing in said county who did not in fact sign said petition, nor authorize any person to sign said petition for them; that 7 other names thereon were the names of persons deceased before said petition was circulated; that 6 other names thereon were the names of minors, residing in said county; that 62 names appeared on said petition in duplicate, and four in triplicate, and that all of such names were placed upon said petition by some person or persons with the intent to procure the ordering of an election and the removal of said county-seat by fraud, and to evade the statutes regulating the relocation and removal of county-seats; and that, in all, 765 names of the said 1964 names appearing on said petition were altogether fraudulent and spurious. And the said relator by said affidavit further alleges and shows, that the frauds contained in said petition as aforesaid were not known by him, nor by the inhabitants of said Pleasanton, until after the pretended election hereinafter mentioned had been held, nor until after the 13th of March 1875; and that said relator and the people of Pleasanton could not ascertain the fraudulent character of said petition before the pretended election hereinafter mentioned was held.

*And whereas,* it is by said affidavit further alleged and shown, that the only election held in said county since the location of said county-seat at Pleasanton as aforesaid for the relocation of said county-seat, was held on the 23d of February and the 9th of March 1875; that on the said 23d of February, the whole number of votes cast was 2084, and

that of these, 853 were cast in favor of Pleasanton, 873 were cast in favor of Mound City, 332 were cast in favor of Barnard, and 26 were cast in favor of La Cygne; that on said 9th of March, 2510 votes were cast, of which 1200 were in favor of Pleasanton, and 1310 were in favor of Mound City; that at said election held on said 23d of February and 9th day of March no place received votes equal in number to a majority of the whole number of legal electors of said county; and that aside from said illegal and insufficient petition, and said inoperative and fruitless election, it is not pretended by you, or either of you, that any petition has been presented to said county board of commissioners, or filed, asking for an election, or that any election has been held for the purpose of removing said county-seat from said city of Pleasanton, or for relocating the same; nor in truth has any such petition been filed or presented, or any such election been held, other than as hereinbefore stated and recited.

*And whereas*, it further appears from said affidavit, that the probate judge, register of deeds and county attorney of said county, still keep and hold their respective offices. and the records, books, and papers thereof, at said city of Pleasanton; and that the probate court of said county is held in said city, and that said city of Pleasanton since the pretended election aforesaid was held has been recognized and declared by the judge of the district court of said county to be the county-seat of said county; *and whereas*, it further appears from said affidavit, that due demand has been made upon each of you to remove your respective offices to said city of Pleasanton and there keep them, and that you neglect and refuse so to do; *and whereas*, it is further shown by said affidavit, that by reason of your said unlawful and wrongful acts, in removing your respective offices, and the books and records thereof, from said city of Pleasanton, and your refusal to return them to said city, and of the transaction of the public business of said county at Mound City, the said relator, and all the other citizens, property-owners and tax-payers of said city of Pleasanton, are injured in their business and their property, and they and the whole people of said Linn county having public or private business to transact at the county-seat are greatly injured and damaged by being compelled to go such distance of seven miles from the county-seat to transact the same, and that said relator cannot have adequate relief without the aid of a writ of mandamus; *and whereas*, said relator prays that a writ of mandamus may be

33—15 KAS.

awarded and issued against said defendants, commanding them to do and perform certain acts in said affidavit and hereinafter specified:

Now therefore, we being willing that due and speedy justice shall be done in the premises, do command and enjoin you, the said *M. E. Woodford, Wm. Worden,* and *W. H. Shattuck,* as county commissioners of said Linn county, that immediately after the receipt of this writ you provide suitable rooms at said city of Pleasanton, the county-seat of your said county, for county purposes; and we do command and enjoin you the said *F. J. Weatherbie,* as county clerk, you the said *Ed. R. Smith,* as clerk of the district court, and you the said *A. G. Seaman,* as county treasurer of said county, and each of you, that immediately after the receipt of this writ, you remove your respective offices of county clerk, clerk of the district court, and county treasurer, to said city of Pleasanton, county-seat as aforesaid, and the books, papers, records, and property to said offices respectively belonging and pertaining, and that you there keep and hold your said offices as by law required; or in default thereof, that you show cause, if any you have, before the supreme court of the state of Kansas, at the city of Topeka, on the 27th of September 1875, why you have not done as herein commanded and required; and have you ·then and there this writ with your return thereon.

Witness my hand, and seal of the Supreme Court [SEAL.] . of Kansas, at Topeka, this 7th of September, 1875.
        A. HAMMATT, *Clerk Sup. Court.*

Said writ is indorsed as follows: "The within writ of mandamus allowed and granted by the Supreme Court, this 7th of September, 1875.        SAMUEL A. KINGMAN, *Ch. Justice.*"

Said writ being served and returned, the defendants appeared and filed a motion to quash said writ, because— "1st, The relator has no capacity to sue; 2d, The action is not brought in the name of the real party in interest; 3d, Said alternative writ does not state facts sufficient to entitle the plaintiff to the relief sought, and does not show any neglect or omission of official duty by or on the part of the defendants." This motion was set for hearing, and was argued, on the 19th of October 1875. A. F. ELY, JOEL MOODY, and McCOMAS & McKEIGHAN, appeared for defendants, in support of the motion to quash. R. W. BLUE,

S. H. Allen, W. R. Biddle, and W. C. Webb, appeared for the relator, in opposition to said motion, and in favor of the mandamus. The case was argued by Messrs. Ely and McComas for defendants, and by Mr. Webb for relator.

*A. F. Ely,* arguing that the motion to quash should be sustained, contended: The alternative writ shows two elections, at the last of which 2510 votes were cast — 1200 in favor of Pleasanton, and 1310 in favor of relocating the county-seat at Mound City. This shows the "consent of a majority of the electors of the county," within the meaning of § 1 of art. 9 of the constitution. The legislation of the state shows the legislature has at all times deemed the number of *votes cast* at county-seat elections as conclusive of the *number of electors* in the county at the time of the election. See laws of 1861, p. 115, § 5, and page 117, ch. 20; laws of 1863, p. 46, § 1; laws of 1864, p. 79, § 1; laws of 1865, p. 71, § 1; laws of 1867, p. 76, § 1; Gen. Stat. of 1868, p. 297, ch. 26, §§ 6 and 7. In each of these enactments the legislature declares that the location of the county-seat shall be located at the place receiving "a majority of the *votes cast*" at the election provided or ordered for such purpose. If the legislature understood that the constitution required the consent of a majority of all the electors of the county, whether voting or not voting, it would have said so, and would have provided some mode for ascertaining *the number* of the electors. This has not been done; while by repeated and continuous legislative declarations, that county-seats shall be located and relocated by "election," and the result in each case determined in accordance with the "majority of the votes cast" at such election, the legislature gives the strongest proof that the safest and most satisfactory mode of ascertaining the whole number of electors is, upon full and fair notice to all the people that an election will be held, to take the number of *votes cast* as the number of *electors of the county*.

How could the board of county commissioners know in advance what was the number of votes in the county? It is

claimed that the "registration law," known as ch. 86, Gen. Stat., (p. 894,) provides an adequate mode. This act was passed in 1867, and provides for an annual registration to be made by the *county* assessor of all "adults," males and females; while the county-seat act, (ch. 26, Gen. Stat.,) was passed in 1868, and § 4 thereof provides that "for the purposes" of such act "the number of legal electors shall be ascertained from the last *assessment-rolls* of the several *township* assessors in the county." But if the "registration-lists" required by said ch. 86 shall be held to be the "assessment-rolls" contemplated by § 4 of ch. 26, (which we deny,) then we contend that said ch. 86 is abrogated by the provisions of ch. 76 of the laws of 1873 providing for an "enumeration of persons" to be made annually by the "township assessors," and no *such list* or enumeration is alleged or shown by the alternative writ to have been made. (See cases in 37 Mo. 270; 38 Mo. 455; 1 Sneed, 690.)

Again: The presumption is, in law, that all electors *not voting* "assent" to the change or relocation of the county-seat. It is the "consent" of the electors, which the constitution requires, without providing in what mode that consent must be ascertained. It is therefore for the legislature to prescribe the mode; and when the legislature provide for an "election," and declare that the result shall be determined by such election, it will be presumed, in support of such legislation, that all electors who stay away from the polls, by their absence and silence "consent" that a "majority of the votes cast" shall determine the question for *all* "the electors of the county."

As to the petition for the election: Sec. 4 of the county-seat act (ch. 26) declares that "the number of legal electors," for the purposes of the petition and the election mentioned in §§ 1 and 2 of that act, shall be ascertained from the "assessment-rolls." The alternative writ alleges that the number of legal electors, as shown by the "registration-list" made in accordance with ch. 86, was 3042; but it does not pretend to state the number as shown by the "assessment-rolls." But

if it did, still the determination of the board of county commissioners is conclusive. The election-petition presented to them contained 1964 names as petitioners for a relocation of the county-seat. The county board acted upon this petition — *acted judicially* — and determined that it was "the petition of three-fifths of the legal electors of the county," and thereupon ordered the election. Their decision in this respect is final, and the court cannot now go behind their determination, and inquire into the legality or sufficiency of the petition.

Again: The alternative writ shows that *two elections* were held — one on the 23d of February, at which no place received a majority of the votes, and the second on the 9th of March, at which there was a majority of 110 votes cast in favor of Mound City. Now we contend that no inquiry can be had in this case into any matter or proceeding *anterior to said second election.* And we think this question is settled in the Howard county county-seat case recently decided by this court, in which the court say: "The amendment of 1872 to the contest-act, providing that 'in no case shall the validity of any election be inquired into beyond the one last had,' * * * plainly indicates that a contest made *after the second election* must be limited to *that election."* (14 Kas., pp. 493, 494.) Now, the facts in the case at bar, as shown by the alternative writ of mandamus, bring the case clearly within the decision quoted from; and it is too late for the relator or plaintiff to inquire into the sufficiency of the petition upon which the *first election* (that of 23d February) was ordered.

*W. C. Webb,* for the relator, submitted: The motion of the defendants to quash the alternative writ, to be a proper proceeding under our practice, must have the force and effect of a demurrer, and as such must admit the facts alleged and stated in the writ. The real question is, Does the alternative writ state facts sufficient to entitle the relator to the relief sought? It is alleged, and is undisputed, that in April 1874

the county-seat of Linn county was legally located at the
city of Pleasanton, and that it legally remained there until
the 9th of March 1875. Then, by order of the defendant
commissioners, (*illegally,* as we claim,) a part of the county
officers removed to Mound City, removing also their respect-
ive offices, and the public records. The alternative writ of
mandamus shows the facts and proceedings constituting the
grounds or pretext on which the defendant commissioners
made their order for such removal; and these facts and pro-
ceedings, we claim, show that the order of removal made by
the defendant commissioners, and the removal made by the
other defendants, were illegal, and that the county-seat still
remains, in judgment of law, at Pleasanton. We assert two
distinct propositions, and upon these we base our demand for
the relief by mandamus, compelling defendants to remove
their respective offices from Mound City to Pleasanton:

1. The county board of commissioners had no jurisdiction
to make the order of January 19th 1875, that the question
of relocating the county-seat be submitted to a vote at an
election to be held on the 23d of February. The county-
seat having been located at Pleasanton "by a vote of the
electors of the county," the county board were powerless to
act unless "upon the petition of three-fifths of the legal
electors of the county;" (§ 2, ch. 26, Gen. Stat.) The alter-
native writ shows and alleges, that —

"Since the location of the county-seat of said Linn county
at the city of Pleasanton as aforesaid, three-fifths of the
electors of said county have not petitioned the board of
county commissioners of said county for a relocation, nor
for a removal of said county-seat; that *a majority of the
legal electors of said county have not consented,* by election,
or in any other manner, to any change of said county-seat
from said city of Pleasanton; that *an official registration* of
the *male adults* of said county of Linn, twenty-one years of
age and upwards, was made *by the assessors of said county* in
the year 1874, as required by law, and filed in the office of
the county clerk; that the whole number of such male adults,
*as returned by said assessors on the assessment-rolls of the sev-
eral townships,* was 3042, and that *the whole number of legal*

*electors in said county for all purposes connected with the ordering, holding, and determining the result of a county-seat election,* in the months of January, February and March 1875, was 3042."

These facts are admitted by defendant's motion. But it is claimed that the "registration" list referred to or stated is one made in accordance with the registration act of 1867, (ch. 86, Gen. Stat., p. 894,) and not the one required or contemplated by § 4 of the county - seat act, (ch. 26, Gen. Stat., p. 297.) This claim is not well founded. The statement in the writ is broad, and was made with special reference to the provisions of both the acts named, and the allegations framed so as to come within the very terms of the county - seat act. That act says —

"Sec. 4. For the purposes of this act, the number of legal electors in the county shall be ascertained from the last assessment-rolls of the several township assessors in the county."

Let it be first observed, that there were no "*township* assessors" when this act was passed, (March, 1868.) The office of *county* assessor was not abolished, nor that of *township* assessor created, until March 1869; (Laws of 1869, pp. 111, 113, ch. 30, § 3.) Said § 4 therefore means, *legal assessors* for the time-being, appointed and authorized by law, if it means anything. So regarding it, the alternative writ states and shows, the making, returning, and filing of an "official registration" of the male adults of Linn county in the year 1874, the returning of the whole number of such adults by the assessors on the "assessment-rolls of the several townships," and then avers that —

"The whole number of *legal electors* in said county, for *all purposes* connected with the ordering, holding, and determining the result of a county-seat election [in Linn county] in the months of January, February and March 1875, was 3042."

This, it would seem, disposes of the technical objection, that the alternative writ counts upon and shows as the basis for the petition a registration of adults made under the regis-

tration act alone.   But it will not escape the attention of the
court, that the language of § 4 of the county-seat act desig-
nating the "assessment-rolls" as the basis for determining
the number of "legal electors," is most bungling, and the
section (if the "assessment-rolls" proper were literally
intended) might well be treated as void for uncertainty.
Nobody having any legal sense would ever take the names
of the persons assessed or taxed, as they appear on the
"assessment-rolls," as the list, or as determining the number,
of legal electors.   Nor is there anything *on, or in,* the "as-
sessment-rolls," by which any person assessed therein can be
"ascertained" to be a "legal elector"—nothing to show
whether such person is an infant, or an adult—a resident, or
non-resident—a citizen, or an alien—or where initials only
are given, whether male, or female.   It is *impossible,* there-
fore, to "ascertain from the last *assessment-rolls* of the several
township assessors" "the number of legal electors in the
county."   The first general county-seat act can be found in
the Laws of 1863, p. 46, ch. 24.   Said act was amended by
ch. 26, Laws of ·1865, p. 71; and further amended by ch. 46,
Laws of 1867, p. 77.   The present act, ch. 26, Gen. Stat.
1868, embraces the general features of the former statutes,
and contains some new provisions, most notable of which is
this bungling § 4, above quoted.   It is due to the revisors,
however, to say that they are not responsible for the section
as it stands.   They reported the section, (Report of Revis-
ors, p. 420, § 3,) as follows:

"For the purposes of this act, the number of legal electors
in the county shall be ascertained from the poll-lists of the
general election next preceding the presentation of the peti-
tions hereinbefore mentioned."

With this clear, sensible, and just provision before them,
it is marvelous that the legislature of 1868 should allow
some ignorant meddler to substitute the almost meaningless
provision now standing as § 4.   But it was done; and it is
proper to find, if we can, some rational construction for the
section as adopted.   It is not reasonable to suppose, as already

shown, that the framer or the legislature intended by the term "assessment-rolls," the roll or rolls made and returned by the assessors showing the real property assessed in the county, with the names of the owners—nor the roll or rolls showing the valuation of the personal property assessed, with the names of the persons so assessed. No one could ever have supposed that such lists or rolls' did or could show the "number of legal electors in the county." Then what was meant? This act was passed and approved in March 1868. At the previous session of 1867, (Laws of 1867, p. 194, ch. 113,) an act was passed "providing for the registration of all adult persons in each county in this state," § 1 of which provided that the assessor, "when making the assessment of personal property," should make a list (or roll) "of all persons of both sexes, twenty-one years of age and upwards, on the first day of March of each year, and file the same in the office of the county clerk, designating the township or ward in which said person resides." Sec. 2 of said act provides that—

"Whenever it is necessary to ascertain the number of adult persons twenty-one years of age or upwards in *any county*, township, or ward, upon which to have *any action of the county commissioners*, or other officers, the list on file in the county clerk's office shall be taken *as conclusive on that subject.*"

The evident intention of this act was, that the assessor should make two lists, one of male adults, and one of female adults; that in all cases where an election or other proceeding should be called or ordered upon the petition of *electors*, the requisite number should be determined from the one list, and where any matter, as in granting licenses to sell intoxicating liquors, (§ 1 of the dramshop act,) should be determined upon the petition of the adults *of both sexes*, the requisite number of petitioners therefor should be ascertained from both such lists. Now, in the light of this registration act of 1867, then on the statute book, and the evident intent of such act, do not the words, "last assessment-rolls," in § 4 of the county-seat act of 1868, mean "assessors' lists" required by said registration act? Granted,

that the words are not happily or aptly chosen. But it is the duty of the court to sustain the act, by liberal interpretation, where the *intent* of the law-maker is apparent, rather than to render it wholly ineffectual by a narrow or strict construction. Giving the acts the construction suggested, and they can be upheld as prescribing a reasonable and proper rule. And so the alternative writ was framed to cover the language of both acts, the facts alleged being within the intent or scope of both. These facts, alleged in the writ, and admitted by the defendants, show that *the number* of legal electors in Linn county, when the petition was presented to the county board in January 1875, was 3042. Three-fifths of this number is 1827. The petition contained 1964 names, all told, of which 765 are admitted to be false, forged, fictitious, fraudulent, etc., leaving only 1199 legal electors — or 626 *less* than the requisite three-fifths; and the county board had no jurisdiction to order an election, and their order therefor, and all proceedings thereunder, are void.

It is worthy of observation, that the manipulators of said county-seat petition, and the county board, regarded said "assessors' lists," showing 3042 male citizens, as the basis for determining the number of legal electors. On that basis, 1827 were the necessary three-fifths. The petition contained 1964 names — only 137 more than the requisite number. The county-seat petition was filed in January 1875. The whole number of "votes cast" at the general election in Linn county in 1874, for representatives, (three districts,) was 1829; for senator, 1795; for associate justice of this court, 1853. If the "votes cast," constituted the basis, 1113 petitioners (being three-fifths of the number of legal electors at the last preceding election) would have been sufficient — and there would have been no need to add 765 false, forged, and spurious names to the 1199 genuine names, in order to bring the case within the jurisdiction and power of the county board.

It is claimed by defendants that, the county board having passed upon and adjudged the petition for an election suffi-

cient, and ordered an election thereupon, which has been held, the question of its legality and sufficiency, with respect to jurisdiction, is *res adjudicata,* and that this court is concluded by their decision. It is hardly worth the while to argue against a proposition seemingly so absurd. If the proposition were correct, then no "petition"—no actual petition by any number of electors—is necessary, for a corrupt and scheming county board can forge and manufacture an entire paper, call it a petition, and affix the requisite number of false and forged names, and names of fictitious persons, and thereupon by their order for an election, wholly override the statute, and defy the wishes and will of the people. A much stronger ground of objection is, that the relator has slept upon his rights—that if he would question the sufficiency of the petition he should have done so before the election was held and the votes canvassed. But this objection is met and answered by the averment in the alternative writ, that—

"The frauds contained in said petition were not known by the relator, nor by the inhabitants of said Pleasanton, until after said pretended election had been held, nor until the 13th of March 1875, and that said relator, and the people of Pleasanton, could not ascertain the fraudulent character of said petition before said pretended election was held."

The relator therefore is not estopped; the adjudication of the county board is not final; and this court, if it finds that the petition did not contain the genuine signatures of competent petitioners equal to three-fifths the number of legal electors, as shown by the "last assessment-rolls," (assessors' lists,) must find that the county board had no power or authority, and must hold that said pretended election of 23d February and 9th March was and is utterly void, and that the county-seat still remains at Pleasanton.

Defendants contend that the amendment of 1872, to the contest act passed in 1871, precludes all inquiry as to the petition, and the jurisdiction of the county board to order the election, because there were *two elections* held, one on the 23d February, the other March 9th. That amendment con-

sists in adding to § 7 of ch. 79 of the laws of 1871, a proviso, as follows:

"*Provided however,* That in no case shall the validity of any election be inquired into beyond the one last had, and upon which the proceeding is based." (Laws of 1872, p. 271.)

And counsel claim that this court in the recent Howard county case—(*Light v. The State, ex rel.,* 14 Kas. 489,) held and decided that in a case like this said proviso applied, and cuts off all inquiry. A single sentence in the opinion of the court, in that case, may seem to hold to that view. But such sentence is *obiter dictum.* The question was not in that case at all. The facts were most unlike the facts here; and besides, the real question there decided was, that the parties aggrieved by the action of the county board, in throwing out and refusing to canvass a part of the returns of the (so-called) first election, should have proceeded at once, and not wait (as they did) until after the (so-called) second election was had— that by so sleeping on their rights, with full knowledge of the facts, and taking the chances in a second election, they were estopped from denying the validity of the first election. And that *decision* was no doubt correct. But to go further, and throw in a reference to the amendment of 1872, *obiter,* was wholly unnecessary. But if the court really intended to ground its decision upon that amendment, or to fortify its decision in that case upon the construction which the court intimates, then we most respectfully submit, that the proviso of 1872 was not designed or intended to have any such application, and will not bear any such construction. The words, "upon which [election] the proceeding [or action] is based," clearly indicate, not merely the isolated fact of receiving ballots on a particular day, but the entire proceedings, anterior and subsequent, necessary to constitute an "election" within the legal signification of that word. Now in this case, upon what *election* does the *relator* base his proceedings in demanding that a peremptory mandamus be awarded against the defendants? Certainly not upon the *vote* of 9th March,

and its result; nor upon that of 23d February; nor upon both together. It is upon *the fact* that the county-seat is legally at Pleasanton, where it was located in April 1874. The *defendants* base their defense upon the pretended election held 23d February and 9th March 1875. So, in this respect, the proviso of 1872 has no application. But we go further, and claim that the word "election," as used in this proviso, does not mean "vote," but means decision, determination, political adjudication; and, whenever it takes two or more "votes" to secure the requisite "consent of a majority of all the legal electors," no one of such votes is properly an "election," but it takes them all, with all the necessary anterior proceedings — petition, order, notice — and the intermediate and subsequent proceedings — canvass and proclamation — to constitute an "election." It is in this sense in which the word is employed in the proviso of 1872. To illustrate: In 1870 the county-seat of Linn county was legally at Mound City. In 1871 it was relocated at La Cygne. In 1873 it was relocated at Farmer City; (14 Kas. 382.) In 1874 it was relocated at Pleasanton. And now it is claimed that the circle is completed, and in March 1875 it was relocated at Mound City. This action is a contest between Pleasanton and Mound City. Let us suppose that Mound City, instead of relying upon the pretended election of 1875, for a *return* of the county-seat, should .insist, and undertake to show in this action or proceeding, that the election of 1871, by which the county-seat was taken from Mound City to La Cygne, was void — that no legal removal had been effected — that all intermediate elections were therefore void, and that Mound City, having again, by an accidental return of the uneasy and migratory wheelbarrow which carries the county-seat, become possessed of that unstable article, is therefore entitled to retain it. In such case the proviso of 1872 would apply, and by its terms and evident meaning, would cut off all inquiry into the validity of the election of 1871, or either of those of 1872, 1873, and 1874. It would in effect say, what this court in the Howard county case said, that the parties

alleging such illegality in an election, either as a cause of action, or ground of defense, were *simply too late* — that their rights, actual or supposed, were lost by their *laches,* and their delays. So too in regard to elections held for the purpose of voting bonds, (for the proviso of 1872 is added to a section in relation to the contest of such elections, as well as county-seat elections.) Take this case : In the city of A. in 1873, the question of voting city bonds to B. for a particular purpose, was submitted to the electors. The election was held, votes cast, and canvass made. The canvassers determine the proposition lost by a trifling majority. In 1874 the same question is again submitted at an election duly called. Votes are cast and canvassed, and the canvass shows the proposition is defeated by a large majority. B. then pretends to have discovered that the canvassers of the election held in 1873 rejected the returns from one ward, which, if canvassed, would have shown a decided majority at such first election in favor of the issue of the bonds, and thereupon brings mandamus to compel the city council as canvassers to canvass the rejected votes, add them to those already canvassed, declare the result, and issue the bonds. Would not this court say, that the proviso of 1872 applied — that such election was not "the *last one had*" upon the same question between A. and B.? Many cases might be put where the proviso of 1872 would apply as a safe rule, without perverting its language, or giving it a strained construction — both of which, it seems to us, are done in holding that the word "election" is synonymous with the word "vote." This word "election," in its broadest and best sense, that is, in its *political* signification, means, the *act* of choosing — *choice* — determination — decision. The "act," is, the necessary and continuous proceedings from the inceptive step to the end. The "choice," or "decision," is the consummation of the purpose for which the "act" was instituted and carried on. This would seem to be the obvious meaning and purport of the words of the proviso in question. To give that proviso the construction contended for by defendants, is to say, that a corrupt county

board and clerk may forge an entire petition, or falsely enter upon their records, that a petition was presented when there was none at all — order a county-seat election — make a false canvass of the votes cast, if necessary to their purpose — order a "second" election, and declare, *beyond the power of judicial review*, that whatever place receives a majority of the votes cast at such "second" election, is the county-seat. And if a petition on which over one-third the whole number of names were forged and fraudulent, corruptly placed there in order to bring it (as to numbers) within the jurisdiction of the county board, is beyond the reach of judicial inquiry here, we may expect to see some interesting proceedings on the part of county commissioners, who in such decision will find immunity for almost every fraudulent and corrupt proceeding possible in regard to county-seat elections.

2. But another proposition remains: If for any reason or cause this court holds against the relator upon the question of jurisdiction or authority of the county board to order an election, then we insist that the result of the election, as canvassed and proclaimed, did not remove the county-seat from Pleasanton to Mound City. We shall assume, as conclusively established by the foregoing considerations, that, at the time of said county-seat election, in February and March 1875, the *number* of legal electors was, and was legally ascertained to be, 3042. Now the constitution provides:

ART. 9, § 1: "The legislature shall provide for organizing new counties, locating county-seats, and changing county lines; *and no county-seat shall be changed without the consent of a majority of the electors of the county.*"

The language of this section is peculiar, and the words employed show that the framers had a deliberate purpose and object in mind, and that the section was carefully framed so as to accomplish such purpose, and secure such object. Let it first be observed, that the question of changing a county-seat need not necessarily be submitted to an *election* at all. Much less does the constitution require that such question shall be determined from the number of "*votes cast*" at an

*election.* The means or manner by which the "consent of a majority of the electors" shall be obtained, is left wholly to the discretion of the legislature. That this clause is indeed peculiar, and is greatly significant, will be seen from the pertinent language elsewhere used in the constitution:

ART. 2, § 13: "A majority of all the members elected to each house, voting *in the affirmative,* [and entered upon the journal,] shall be necessary to pass any bill." (See also, § 5 of Art. 11.)

ART. 11, § 6: Certain laws proposing the creation of public debts must be "submitted to a direct vote of the electors of the state at some general election," and to have any effect must be "ratified by a majority of all the *votes cast.*"

ART. 13, § 8: "No banking law shall be in force until the same shall have been submitted to a vote of the electors of the state at some general election, and approved by a majority of all the *votes cast* at such election."

ART. 14, § 1: Proposed amendments to the constitution must be submitted to the electors at a general election, and to be adopted must be approved by "a majority of the electors *voting on said amendments.*"

ART. 15, § 8: The permanent location of the capital was to be submitted to a popular vote, "and a majority of all the *votes cast* at a general election shall be necessary for such location."

SCHEDULE, §§ 9, 11: The adoption of the constitution was submitted to an election to be held "on the first Tuesday in October 1859," and to have any force or effect must receive "a majority of all the *votes cast* at such election."

SCHEDULE, § 25: The homestead-clause (§ 9 of art. 15,) was to be voted upon separately, "and if a majority of all the *votes cast* at said election shall be against such provision, then it shall be stricken from the constitution."

Now we submit, that when in every other instance the mode of submission or decision, and the rule as to sufficiency, are both succinctly set forth in the constitution, that instrument, as to the change of county-seats, silent itself as to the *mode* of effecting the change, gives unrestricted power to the legislature in that regard, but specifically requires that, whatever the mode, *no change shall be made "without the consent of a majority of the legal electors of the county,"* surely,

the peculiar form of expression must challenge the attention and careful consideration of every thoughtful man. The language is prohibitory — "no county-seat shall be changed without the consent of a majority of the *legal electors.*" How is the *number* of legal electors to be ascertained? "The legislature *shall provide* for locating county-seats." This is mandatory, and imposes upon the legislature the duty to provide by law for ascertaining the number. This duty the legislature undertook to perform by the acts of 1867 and 1868, (chapters 86 and 26, Gen. Stat.) It was and is within the power of the legislature to provide for changing county-seats by petition alone, or by the order of the county board, or order of the district court, or district judge, or in any other manner, provided a mode for ascertaining the *number* of legal electors in the county be ascertained, and a majority of such legal electors give their consent to the change. And this "consent" may be given by petition, letter, or vote, as the legislature may choose to prescribe. It is claimed by defendants, that the legislature has by law said that *an election* shall be the mode for ascertaining the judgment of the electors, and that the statute says that a *majority of the votes cast,* shall be sufficient. This is conceded. But the legislature has not said that the number of "votes cast" at such election shall be deemed and held to be the "number of legal electors in the county." They might have said so, but they did not. On the contrary, recognizing the fact that many legal voters do not vote, the legislature, in 1867, provided for a registration by the assessors of the male adults, and made such assessors' lists the guide for the county board in certain official proceedings; and in the county-seat act, in 1868, these assessors' lists were most undoubtedly intended to govern and control as to the number of "legal electors," for all purposes pertaining to the removal or location of county-seats. We therefore contend that the provisions of §§ 6 and 7 of the county-seat act, that a majority of the "votes cast" can determine the election, must give way to the paramount command of the constitution, which requires the consent of

34—15 KAS.

a majority of all the "legal electors" in the county, whether they vote or not. But it is urged, that those who do not vote, by their absence and silence give their consent to the change. On the other hand, it seems to us that, in this case, absence and silence must be held to be *non-consent.* It is like the vote of the senate or house on the passage of a bill. The constitution provides that "a majority of all the *members elected* to each house, voting in the affirmative, shall be necessary to pass any bill." Every absent member therefore counts "no," just as effectually as if he were present and voted "no." To change a county-seat, the "*consent* of a majority" of *all* the legal electors—is required—not their *silence.* The people understand this; and those who are *opposed* to any change of the county-seat, and have no disposition to fool away a day or two every six months in watching the movements of that uneasy vehicle which carries the county-seat from place to place, reason thus: "I am opposed to any removal of the county-seat. If I go to the election, I shall vote *against* removal. No removal or change can be made unless a majority of all the electors in the county consent. The whole number of legal electors has been ascertained, and is known, and my vote against removal will have no greater effect than my silent dissent. *Consent* is required. To give consent, requires *action, affirmative* action. It will take 1522 votes in favor of removal to change the county-seat, and it matters nothing whether the votes cast against removal be many, or few, or none. As I shall not give my consent, I shall stay at home and attend to my business." It would seem that, in view of the requirement and the prohibition of § 1 of art. 9 of the constitution, above quoted, no satisfactory answer can be made to an elector who reasons in that way. When "consent" is *positively required,* when it is made an indispensable condition, the argument, that the absent voter, by his absence consents, is a weak one. (See cases in 32 Mo. 398, and 41 Mo., 44.) What then is the conclusion? The number of legal electors was 3042. At the vote taken in March, (the so-called second election,) the number of

votes cast was 2510—1200 for Pleasanton, (against removal,) and 1310 for Mound City, (for removal.) A majority of 3042 is 1522. The vote for Mound City is 212 short of the number requisite to show "the consent of a majority of the legal electors" to a change of the county-seat. The order of the county board, upon which the defendants rely, is void, and the relator is entitled to a peremptory mandamus commanding the defendants to return their offices and records to Pleasanton.

*H. C. McComas*, for defendants, and in reply, enlarged upon the points submitted by his associate, (Mr. Ely,) and in addition, he contended: The relator is concluded by the act of 1872, limiting all inquiry to the second election. The county-seat act in very terms provides for a "first election," and a "second election;" and it would be strange if the word had a different signification in another statute upon the same subject. "Election," in its popular sense, has reference to the receiving, counting, and returning of ballots on any given question, or for the filling of a public office, or public offices, on a particular day duly designated for that purpose. In this sense it is correct to say there were *two* elections—one held on the 23d of February, and the second on the 9th of March. And as the rights of the defendants here are grounded upon such second election, "the one last had," no inquiry can be made, if the statute of 1872 has any force at all, in regard to the validity of such *first* election, nor concerning the petition upon which such election was ordered. (See Brightley's Election Cases.)

2. The relator has mistaken his remedy. The action of the county board in ordering the election, was not void, even though the petition therefor had in fact only 1199 genuine signatures of electors attached. At most, their action was simply erroneous, and the relator, or any party who was aggrieved by such error, might have appealed from the decision or order of the county board to the district court; § 30, ch. 25, Gen. Stat. Failing to appeal within the time

' prescribed by said § 30, the relator's right to have such order and decision of the board reviewed, is gone. He cannot do indirectly in this proceeding, what he has now (by reason of his omission to appeal in time) no longer a right to do directly.

3. The alternative writ is fatally defective. It states no cause of action. It does not allege that the 1199 names, whose genuineness is not denied, but which is admitted, did not constitute three-fifths of all the legal electors in the county at the time the petition was presented to the county board. Counsel for relator argues that such is the import of the averments. But the naked allegations of the alternative writ fall short of stating such fact, and inferences are not sufficient to sustain the writ as against our motion to quash because of the omission to state facts showing the relator to be entitled to the relief which he seeks. All the averments in the writ in relation to, or which are to be supported by, the registration act of 1867, (ch. 86, Gen. Stat.,) are mere surplusage, as that act cuts no figure whatever in any county-seat election, nor in any county-seat contest. The legislature having provided no other certain or satisfactory mode for ascertaining and determining "the number of legal electors in the county" for the purposes of county-seat elections, and having provided that the question of changing county-seats shall be submitted to the people at elections called specially for that purpose, the number of votes cast must be taken and held as the whole number in the county; and a majority of those cast, in favor of a change, is sufficient proof that a majority of all the electors consent to such change.

The opinion of the court was delivered by

BREWER, J.: Two questions were presented and discussed by counsel in the argument of this case. First: Where a petition for the relocation of a county-seat has been presented to the county commissioners, and acted on by them, an election ordered, two elections had, the first not resulting in a majority for any place, the votes canvassed, and the place receiving the

majority of the votes at the second election declared the county-seat, will the court inquire into the sufficiency of the *petition*, and hear testimony to show that some of the names thereon were improperly there, and that therefore it did not contain the requisite number of petitioners? Second: If a majority of the votes actually cast at a county-seat election are in favor of one place, and it is declared the county-seat, will the court under our statutes receive any other evidence to show that the number of legal voters in the county exceeded the number of votes cast, and inquire whether the place declared the chosen county-seat actually received the expressed consent of a majority of the electors. Both of these questions were argued with great ability by the respective counsel, and are of no little difficulty. But after a careful consideration we are constrained to answer both in the negative.

In reference to the first question it may be remarked, that the manner of contesting county-seat elections, and the extent to which the courts may go in such contests, is regulated by statute. There is in the nature of things no absolute necessity for a petition of any kind. The legislature may authorize the commissioners, without any petition, and upon their own motion, to submit to the people the question of a change in the county-seat. Or, requiring a petition, it may specify the kind of petition, the number of signers, etc. It may leave the action of the commissioners open to investigation in the courts, or it may make their determination conclusive as to the sufficiency of the petition. Now, in the winter of 1871, in the case of *The State, ex rel., v. Stockwell,* 7 Kas. 98, construing the statute of 1869, (Laws of 1869, ch. 27, p. 101,) we held that under the authority therein given we could inquire into any of the preliminary matters — that any matter of substance enjoined by law, and omitted, or improperly done, could be shown for the purpose of invalidating the election. There was no restriction in the statute, and the right was given to "contest the validity of the vote." And this as we held was broad enough to include all prior

proceedings. The law of 1871, while making many changes, made, in this respect, only a verbal change. It provided that "the validity of the election * * * shall be tried and determined." (Laws of 1871, p. 193, § 7.) But the subsequent legislature, that of 1872, amended by adding this proviso: "*Provided however*, that in no case shall the validity of any election be inquired into beyond the one last had, and upon which the proceeding is based." (Laws of 1872, p. 271, § 1.) Now, by this proviso the legislature plainly intended some restriction on the limits of inquiry in such contests. Coming at the session after the decision of this court construing the statute, it is not unreasonable to suppose that it was made with reference thereto, and was intended to cut off some portion of the broad field of inquiry to which that decision opened.. It meant to say, that when a contest was made, some things should be considered final, and not open to attack. It says, that only the validity of the *last* election, the one upon which the proceeding is based, shall be inquired into. Now the only case in which the law contemplates two elections is, in the relocation of county-seats. Does it not plainly follow, that when the two elections have been held, it means to forbid inquiry into the validity of the first? that the courts were bound to accept the prior election, and consequently the proceedings upon which it was based, as valid and regular, and could only inquire whether the last election was legally conducted, and the actual result of the voting legally ascertained and declared? Counsel, to obviate the force of this argument, contend that the term "election" does not properly apply to the separate days' voting—that there is no "election" till a result is reached, and some place has received the requisite majority—that in the word is involved the idea of *choice*, and *selection*, and that there is no choice or selection until some place is chosen or selected. Counsel may be technically correct in his definition; but the legislature has in the very statute used the word in a different sense. It speaks of the first day's voting as an "election," and says that, if at that election no place receives a majority,

a second "election" shall be had. And such is a common use of the term. Now when the legislature has used a word in a statute in one sense, and with one meaning, when it subsequently uses the same word in legislation respecting the same subject-matter, it will be understood to have used it in the same sense, unless there be something in the context, or the nature of things, to indicate that it intended a different meaning thereby. The courts may not give it a different meaning to sustain their views of what the law ought to be. They must seek simply to ascertain the legislative intent, and then enforce it. We conclude therefore that we cannot now inquire into the sufficiency of the signatures to the petition. (*Light v. The State, ex rel.*, 14 Kas. 489, 493.)

The second question is even more difficult. The constitution, art. 9, § 1, reads: "No county-seat shall be changed without the consent of a majority of the electors of the county." If there are three thousand electors in a county, and only thirteen hundred vote in favor of the change, by what right can the legislature override the constitution, and say that the change may be made without the express consent of the majority? We do not doubt the restricting power of the constitutional provision; and whenever by any of the ordinary or prescribed means of ascertaining the fact, it appears that a majority of the electors have not consented to the change, no change can be had. The question is not as to the effect of a fact, but the means of ascertaining it, the evidence to be received. Within certain limits the legislature has power to prescribe what shall be evidence, *prima facie*, or conclusive, of any fact. It may say that a tax-deed shall be *prima facie* evidence of the regularity of all the prior proceedings; that a judgment, or an award, shall be conclusive evidence of the amount due from the defendant. And when this evidence, which the legislature has prescribed, is produced, the courts must accept the fact as established. In this case, the legislature has said that the place receiving a majority of *the votes cast*, shall become the county-seat — thus making the number of votes cast the evidence of the number of electors. Doubt-

less the legislature might make other things evidence of this
fact. It might require, as preliminary to every election, a
registration, and make that registration the evidence. We do
not mean that it may, by the mere machinery of rules of evi-
dence, override or set at naught the restrictions of the consti-
tution, or that it could arbitrarily make conclusive evidence
of the number of voters, any list, or roll, which in the nature
of things has no connection with that fact, and does not
reasonably tend to prove it. But when it adopts as conclu-
sive evidence of the fact anything which, according to the
ordinary rules of human experience, reasonably tends to prove
the fact, the courts are not at liberty to ignore or go behind
such evidence. Now it is not merely the privilege, but it is
the duty of every elector to vote. It is one of the obliga-
tions of citizenship. True, as a matter of fact every elector
may not vote. So too every elector may not be registered.
Yet there is a reasonable connection between either the num-
ber of votes cast, or the registration-list, and the number of
electors, sufficient to justify the legislature in declaring that
either of the former shall be deemed conclusive evidence of
the latter. If it were not so, then that finality which in the
best interests of society is often as important as mere cer-
tainty, might be fearfully endangered. If the legislature
could not establish any such easily-ascertainable and con-
venient evidence of the fact, but the inquiry must always go
to the actual number of persons in the county on the day of
election having the legal qualification of electors, it is patent
that at least in the larger and more densely populated coun-
ties an investigation might be opened, the cost and time of
which would be simply immense. The injury which would
result to the community from the suspense and delay of such
an investigation, far exceeds that which flows from the possi-
bility that there were enough voters who did not vote, or
were not registered, to have changed the result. While the
constitution must be accepted as the binding law, yet it must
be construed in the light of common customs and accepted
facts. And the three ordinary and recognized modes of

ascertaining the number of electors, are, the census, a regis-
tration, and the actual voting. Neither of them may, in any
given case, be exactly correct. Yet how little of testimony
points with unerring certainty to the ultimate fact. Almost
every kind of evidence is liable to come short of absolute
exactness. Yet with these, as the ordinary evidences of the
number of electors, if the constitution sought to compel a
resort to other and more difficult, if more accurate evidence,
it would seem as though such testimony ought to have been
indicated. It provided for both a census, and a registration.
Const., art. 2, § 26; art. 5, § 4. Is it unreasonable to sup-
pose that it contemplated thereby all the uses to which they
were ordinarily, and might reasonably be put, and among
them that of furnishing the evidence of the number of elect-
ors? True, the legislature has in this respect failed to avail
itself of either of these two kinds of testimony. But is it
thereby restricted from falling back upon that testimony
which, in the absence of census and registration, is the ordi-
narily-accepted evidence of the number of electors, to-wit,
the number of votes cast? It is a general rule, in respect to
elections, that where the number of the electoral body is
fixed, as in case of the directors, or members of a corpora-
tion, or a legislature, there a majority means a majority of
the whole body. But where the electoral body is indefinite
in numbers, as in ordinary popular elections, there a majority
means a majority of the votes actually cast. But it is said,
that the framers of the constitution evidently had this gen-
eral rule in mind, and made special provisions for the several
elections. Thus, for the passage of any bill or joint resolu-
tion, "a majority of all the members elected to each house
voting in the affirmative," is necessary: Const., art. 2, § 13.
To authorize the contraction of certain indebtedness, the pro-
posed law must "be ratified by a majority of all the votes
cast, at such general election:" Art. 11, § 6. To adopt
amendments to the constitution requires only "a majority
of the electors voting on said amendments:" Art. 14, § 1.
Having been só precise in these matters, must it not be held

that they intended to be equally precise in forbidding the change of a county-seat without the consent of a majority of the electors? There is doubtless great force in this argument. But the objection to it is, that it simply brings us to the point of greatest difficulty, and that is, the determination of *what evidence* shall be accepted as conclusive of the fact. It must be noticed, that *the vote* of a majority is not necessary, nor even the formality of *an election*. The consent of a majority of the electors, in whatever form expressed, whether in election, or by petition, or otherwise, is sufficient. May it not be said, with great force, as it is often said in reference to ordinary popular elections, that those not voting consent to the action of those voting? Suppose that the matter was thrown open to full investigation, and an inquiry made as to the actual number of electors present in the county on the day of elections: would it be other than carrying out the strict letter of the constitution to inquire as to each elector not voting whether he consented to the change, and if the same proportion ran through the non-voting as the voting electors, to uphold and enforce the already-declared result? And yet, the mere statement of such a range of inquiry carries its own refutation. It seems to us therefore, that where the legislature has provided *an election* as the means of ascertaining the wishes of the electors of a county in reference to a change of the county-seat, and has made no provision for a registration, and has designated no other list or roll as the evidence of the number of electors, it may, under the constitutional provision quoted, declare that the place receiving a majority of *the votes cast*, shall be the county-seat. As these county-seat elections cannot be held on the days of general elections, these considerations do not apply to cases where two or more questions are submitted at the same election, and more votes are cast upon one question than upon another, for there the highest number of votes cast upon any one question is clear evidence of the number of voters, which may not, in view of any such constitutional restriction as above quoted, be disregarded in any contest arising as to the decision of the other questions.

Nor perhaps do they apply to cases where two elections are held so near together in time, that the courts may fairly say that the difference between the number of votes cast upon the two elections cannot reasonably be accounted for upon the theory of a change in the number of electors. In the consideration of this question we have examined carefully the following cases, some suggested by counsel in this case, others cited by counsel in a case of contested county-seat election, from Osage county, and others not cited by either: *Taylor v. Taylor*, 10 Minn. 107; *The People, ex rel., v. Warfield*, 20 Ill. 159; *L. & U. Rld. Co. v. County C. H. Davidson Co.*, 1 Sneed, 691; *State v. Winkelmeier*, 35 Mo. 103; *State, ex rel., v. Mayor St. Joseph*, 37 Mo. 270; *State v. Binder*, 38 Mo. 450; *State v. Sutterfield*, 54 Mo. 391; *Gillespie v. Palmer*, 20 Wis. 544; *Chester & L. N. G. Rld. Co. v. Comm'rs Caldwell Co.*, 72 N. C. 486; *Hawkins v. Supervisors Carroll Co.*, 50 Miss. 735.

But it is said by counsel, that in the 4th section of the act relating to the removal of county-seats, (ch. 26, Gen. Stat. 247,) the legislature has provided that, "for the purpose of this act, the number of legal electors in the county shall be ascertained from the last assessment-rolls of the several township assessors in the county;" and that this makes another list the evidence of the number of electors, and that, as alleged, according to such list, the requisite majority was not obtained. The only "assessment-roll" prepared by township assessors required or authorized at the time of the passage of this county-seat act was that of personal property, on which the assessor was required to place a list of the persons, companies or corporations, in whose names the personal property was listed. (Gen. Stat. 1040, § 61.) Now it was not claimed by counsel that according to *this roll* the number of votes cast was less than the number of voters; but the roll to which he refers was that required by ch. 86 of the Gen. Stat., "An act for the registration of adults." But the objection to that is, that that registration-list is in no particular within the description of the roll specified in said § 4. It is not, or at least was not at the time of the passage of the county-seat act,

a roll prepared by the township assessors, but one prepared by the county assessor. It is in no sense an "assessment-roll," but a *registration-list*. It is not therefore within the letter of the statute; and there was at the time an assessment-roll prepared by the township assessors, as above indicated, which was within the letter. Nor is it within the spirit; for this registration list is not of *electors*, but of "adults, over twenty-one years of age." It includes both sexes, aliens, convicts, and other non-electors, as well as the electors; and no discrimination or distinction is called for. So that there is no means of ascertaining from this list the exact number of electors, and no greater probability of exactness, than is furnished by the returns of votes cast. And to make such registration-list conclusive in the matter of the voting, as well as to the number of petitioners, is in plain disregard of the express direction of the legislature, that a majority of the votes cast shall decide.

These questions arise on a motion to quash an alternative writ of mandamus, and the motion to quash must be sustained.

All the Justices concurring.