W. J. BAILEY, *as Governor, etc.*, v. T. T. KELLY, *as ·State Treasurer, etc.*

No. 14,270.   ( 79 Pac. 735.)

SYLLABUS BY THE COURT.

APPROPRIATION FOR EXECUTIVE RESIDENCE—*Act of 1903 Construed.* The act of 1903, appropriating money for maintaining the executive residence, does not authorize the employment of any part of the sum so appropriated for the purchase of provisions to be used there.   If given such construction, the act would, to that extent, be in contravention of the constitutional prohibition against increasing the compensation of the governor during his term of office, and therefore void.

Original proceeding in mandamus.   Opinion filed February 11, 1905.   Writ denied.

*Loomis, Blair & Scandrett*, and *Frank Doster*, for plaintiff in error.

*Gleed, Ware & Gleed*, and *F. Dumont Smith*, for defendant in error.

The opinion of the court was delivered by

MASON, J. :  This is an original proceeding in mandamus brought to require the state treasurer to countersign a warrant for $162.89, issued by the auditor of state.   It involves the construction of the statutes

relating to the residence provided by the state for the use of the governor.

The act of 1903 (Laws 1903, ch. 13, § 1) making provision for the ordinary expenses of the executive and judicial departments of the state government included in the amounts appropriated to the governor an item of $2000 for each of the years ending January 1, 1904, and January 1, 1905, the purpose of which was indicated by the mere phrase "maintaining executive residence," unaccompanied by any words of enlargement, limitation, or explanation. It appears from the pleadings, evidence and agreed facts that the greater part of the amount so appropriated was expended under the direction of the governor in providing for lighting and heating the executive residence, for household service, repairs and like matters, and in adding to its permanent equipment of furniture and utensils. During the period indicated its occupants entertained guests upon public, semipublic and other occasions in the spirit of official hospitality deemed to be in keeping with the *quasi*-public character of the place. As an incident to such entertainment it was necessary that food be purchased in excess of what would have otherwise been required. No effort was made to keep any separate account of the additional expense so occasioned, but charges for food supplies in an amount considered in a general way approximately to correspond to such increased cost were from time to time made against the fund appropriated for maintaining the executive residence and, with the approval of the attorney-general, they were allowed by the auditor and paid by the treasurer. The warrant here involved was issued in November, 1904, upon an account rendered in pursuance of this custom, for a part of the supplies purchased in the

two preceding months.   The refusal of the treasurer to countersign it is based upon the contention that the law does not authorize the payment by the state of any amount whatever for food used at the executive residence ; and the soundness of this proposition is the sole question presented for determination.

In support of the defendant's position it is argued that the very words in which the object of the appropriation is stated preclude any other view ; that these words are not merely inappropriate to express a purpose that a part of the amount named should be expended in supplying the table at the governor's official home, but that they are incapable of such interpretation under any circumstances ; that by no breadth of meaning or liberality of construction can a "residence" be said to be "maintained" by supplying victuals to be there eaten.   The precise question to be decided, however, is narrower than this.   It is not whether the words employed might ever receive such a meaning, but whether such a meaning can be fairly attributed to them in the present instance ; not what they might mean, but what they do mean.   If, prior to the passage of the act in which they occur, the state had definitely assumed, in whole or in part, the burden of keeping a full larder at the residence provided for the governor, it might plausibly be claimed that the words were used with that in view, and disclosed a purpose to devote the sum named to maintaining such residence as a place where entertainment, including sustenance, was to be provided at the expense of the state ; for the object of the several items of a general appropriation bill prepared to meet existing demands may be supposed to be merely indicated by phrases chosen for their brevity and convenience, rather than fully described in apt and accurate language.

Prior to this enactment no such obligation had been assumed. The only legislation on the subject was chapter 7 of the Laws of 1901, by which the purchase of an executive residence was authorized. That act appropriated to the executive council $33,000 for the purchase, furnishing and equipment of such a residence, and $2000 for ''maintaining and repairing'' it for two years. That ''maintaining'' as there used had no reference to supplying food is manifest. There is nothing in the context to suggest it; the somewhat detailed enumeration of things to be provided by the state, including furniture, carpets, utensils, light, and heat, warrants the inference that if food had been in contemplation it would have been specifically mentioned; and the association of the words ''maintaining'' and ''repairing'' suggests a similarity of meaning. The inquiry, therefore, is whether the appropriation act of 1903, either by its very terms, or as interpreted in connection with other acts, indicate a change of legislative policy and the assumption of a new liability by the state.

To say that the words ''maintaining executive residence'' do not, in and of themselves, include or imply the furnishing of food to be there eaten is practically to exhaust the subject. No refinement of definition, no wealth of illustration, can add to, or take from, the simple statement that, standing alone and without aid from any outside source, they do not and cannot convey that meaning. Moreover, it is a recognized canon of construction that ''whenever a legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense, unless there be something in the context or the nature of things to

indicate that it intended a different meaning thereby.''
( *County Seat of Linn Co.*, 15 Kan. 500.)    As already
suggested, the appropriation made in 1901 for "main-
taining and repairing said (executive) residence'' had
obvious reference to the keeping up of the physical
property—the house and its appurtenances.    The
same word, "maintaining,'' used in the act of 1903
in the same connection, should not be given a different
meaning unless in virtue of some extraneous reason.
If any such reason exists it must be found in these
facts :  (1) No mention of repairs was made in this act,
but there was included in the miscellaneous appropria-
tion bill of 1903 (Laws 1903, ch. 35, § 1, ¶ 31) an item
of $1000 for cleaning walls and purchasing pictures
and furnishings at the governor's house, and another
of $500 for repairs on the house and walks ;  (2) the sal-
ary of the governor was at the same session (Laws of
1903, ch. 240) increased from $3000 to $5000, it being
recognized, however, that this change could not be-
come operative until 1905 ;  (3) the control of the ex-
penditure of the maintenance fund was transferred
from the executive council to the governor, and fixed
at $2000 a year, whereas the amount previously ap-
propriated for maintenance and repairs had been but
$1000 a year.    The separate provision for repairs and
equipment gives room for the argument that the
amount set apart for " maintaining'' the residence
was not intended to cover such matters.    The increase
in the governor's salary may, perhaps, be attributed
to a belief that he could not, upon an official income
of $3000 a year, support an establishment at his of-
ficial home in a manner thought to be suited to the
reasonable requirements of his position ; and it may
possibly be inferred that the legislature, realizing that
no change in his compensation could become at once

effective, sought as a temporary expedient to meet the immediate demands of the situation by placing in his hands the sum of $2000 a year, with the design that a part of it should be expended in his discretion for expenses incident to the fulfilment of his social obligations, and to the exercise of the civilities expected from him as the head of the state government. Color is lent to this theory by the transfer of the control of the maintenance fund from the executive council, and the increase in its amount, especially in view of the provision made elsewhere for repairs.

These considerations certainly have a tendency in the direction suggested, yet they are not so forcible as plainly to compel the conclusion indicated and to place the question of the meaning of the act beyond all controversy. It therefore is pertinent to inquire into the power of the legislature, under the constitution, to enact such a law, assuming that it was intended for this purpose, for it will never be supposed that a statute was designed to conflict with a constitutional provision, if any other construction can reasonably be given it.

Our state constitution provides (art. 1, § 15) that the officers of the executive department, including the governor, "shall, at stated times, receive for their services a compensation to be established by law, which shall neither be increased nor diminished during the period for which they shall have been elected." Similar provisions in other constitutions are common. They have often been construed and applied by the courts. (23 A. & E. Encycl. of L., 2d ed., 400, 401; 37 Cent. Dig. cc. 1955–1959; 29 id. cc. 1657–1659; 44 id. cc. 2053, 2054.) Their purpose and beneficial effect and the need of rigid adherence to them have been the subject of frequent, although perhaps super-

Bailey v. Kelley.

fluous, elaboration.  An editorial note at page 282 of volume 54 of the Central Law Journal condemns the tendency to shrink from their just enforcement in a criticism which is of much force, whether or not it be justified by the particular case to which it is applied. It is needless to cite authorities in support of the proposition that courts should not countenance any attempt to evade the effect of the provision in question or to accomplish the prohibited results by indirection.

It requires no argument to demonstrate that a substantial increase in the compensation of an official is accomplished by placing at his disposal a sum in addition to his salary to be expended by him in the purchase of food to be used at his residence by himself, his family, and his guests, although such sum may not exceed the amount by which his household expenses may be increased by the practice of the social amenities appropriate to his position, where there is no separation of the expenditures to be made in the ordinary course of his domestic life and those to be incurred in the exercise of what might be classed as public and official hospitality.  If a sum were set apart to be used for specific entertainments authorized to be given at the public expense a different question would be presented, but that is not the case here.

The force of these considerations has been at least tacitly acknowledged by plaintiff's counsel, and a theory has been advanced to avoid the conclusion which seems their natural consequence.  It is urged that the legislature has established the executive residence as an institution where the chief executive might do the honors of the state and extend the courtesies of his office ; that such action has imposed upon the governor new duties involving in their performance the incurring of new expenses ; andthat it is

competent for the legislature to provide for making
these additional expenses a public charge. It has been
held that where the constitution forbids an increase
in the compensation of an official during the term for
which he has been elected an allowance may be made
for incidental expenses of his office to be determined
by the necessity which may be developed (*Kirkwood
v. Soto*, 87 Cal. 394, 25 Pac. 488) ; and that additional
payment may even be made to him for the perform-
ance of new duties imposed which are not germane
to his office (*Lewis, Auditor, v. The State, ex rel. Har-
rison et al.*, 21 Ohio C. C. 410 ; see also *State v. Cheet-
ham*, 21 Wash. 437, 58 Pac. 771, and *State v. Grant*, 73
Pac. [Wyo.] 470, and cases cited) ; but that no such
payment may be made for the performance of any new
duty which is of the same general character as those
previously existing (*Pierie v. Philadelphia*, 139 Pa. St.
573, 21 Atl. 90 ; *Hall v. Hamilton*, 74 Ill. 437) ; and
that where an officer's salary has been fixed upon the
assumption that certain expenses will be paid by
him, the legislature may not afterward provide for
their payment by the public. (*State, ex rel., v. Raine,
Auditor*, 49 Ohio St. 580, 31 N. E. 741 ; *Wren v. Lu-
zerne Co.*, 9 Pa. Co. Ct. 22 ; *Wheelock et al. v. The
People*, 84 Ill. 551.)

The argument made that the allowance of a sus-
tenance fund may be justified as a mere provision for
the expense of performing a newly imposed duty, even
if otherwise tenable, fails at two points. In the first
place, there is no legal duty resting upon the governor
to do any amount of entertaining at the executive resi-
dence, or even to occupy it at all. The obligations
in these respects arising from the proffer of a place of
residence by the state are but those of comity. How-
ever binding they may be upon the sense of propriety

of the incumbent of the office of governor, they do not originate in the law, and cannot be classed as official duties, for the purposes of the present discussion. In the second place, whatever these obligations may be, they existed in 1901, while the salary of the governor was fixed at $3000, without additional allowance for any expenses incidental to their fulfilment. Consequently, for the state in 1903 to have assumed liability for the payment of such expenses would have been to increase the compensation of the governor during the term for which he was elected. It cannot be supposed that this was the purpose of the legislature, since it would have been in violation of the constitution.

It must be held that the language of the statute providing a fund for maintaining the executive residence is not broad enough to cover the purchase of provisions for use there under any circumstances, and that the writ asked for must be denied.

All the Justices concurring.