THE STATE OF FLORIDA EX REL., CHAS. B. SMITH, ET AL., RELATORS, VS. JOHN Q. BURBRIDGE, ET AL., RESPONDENTS.

1. Whenever a power is given by statute everything necessary to the effectual execution of the power is given by implication. The failure of a statute to declare the mode of proceeding under it does not defeat its purpose.

2. Where a statute incorporating a municipality designates the officers to be elected, prescribes the qualification of the voters and provides for the division of the territory into wards, and in what ward an elector may vote, and fixes the day on which the election shall be held, and adopts as applicable to such election the general provisions of law governing elections, the omission from the statute of any express provision designating a polling place in each ward, or authorizing particular officers or persons to do so, and to appoint inspectors, and the further omission of provisions for the compilation of the result of the election as ascertained by the several precinct inspectors, does not render the statute inoperative. The power to supply such omission is granted by implication to the voters of the municipality.

3. It is the duty of a court to sustain an election authorized by law, if it has been so conducted as to give a free and fair expression of the popular will, and the actual result thereof is clearly ascertained.

4. Where an election has been held under statute of the character in-

dicated above at the time specified in it, and at polling places previously designated at the instance of the voters and advertised as the places at which the same would be held in the several wards, and there was no uncertainty as to either the time or place of holding the election, and it has been so advertised and conducted as to give every voter an opportunity to vote, and has been free and fair, and the result of the vote as actually cast is clearly ascertained, and no essential provision of the statute authorizing or applicable to the election has been violated, such election is legal, and will be sustained.

This is a case of original jurisdiction.

The Jacksonville charter acts of 1887 are Chapters 3775, approved May 31st, and 3776, approved June 2d.

One of the provisions of section 1, of article IV, of the former act, is that " the first election for Mayor and Councilmen shall be held on the second Tuesday in December, 1887, and the Mayor and one-half the Councilmen shall be elected biennially thereafter, and the persons elected shall be sworn into office on the second day following."

The territory covered by the new city of Jacksonville, as established by these statutes, includes that covered by the cities of Jacksonville and Fairfield, and part of that covered by the city of LaVilla, as they existed at the time of the approval of the former chapter.

Section 1, of article XIV, of Chapter 3775, declares that the existing charters of the three cities just mentioned are " hereby abolished," but section 2, of Chapter 3776, enacts " that the officers of the cities of Jacksonville, LaVilla and Fairfield, whose charters were abolished by " the former act, " respectively, shall continue to discharge the duties of their respective offices, until the officers of the municipal corporation succeeding thereto shall have been elected and shall have qualified ;" and it continues in force all city ordinances, not inconsistent with the new acts, until they

shall be repealed or amended by the succeeding city government, or shall expire by their own limitation.

An election was held for Mayor and Councilmen of the new city government on the second Tuesday in December last, the day named in the former chapter, and it is claimed that the relators, Smith and others, were duly elected Mayor and Councilmen, and that having been sworn into office, they are entitled to perform the duties of the same; and further, that the functions of the respondents as Mayor and Aldermen of the old city of Jacksonville ceased upon the qualification of the relators as officers of the new city.

Respondents claim that the election was illegal, and is of no effect to terminate their functions; and the points raised involve a consideration both of the sufficiency of the regulations provided by the statute, and of the manner in which the election was held, for a valid election.

By section 1, of article II, of the former chapter, the Mayor is to be elected by the qualified electors of the city at large.

The first section of article III provides that the City Council shall consist of two Councilmen from each ward of the city, and as to the election of the second Tuesday in December, it enacts that the candidate for Councilman who shall receive the highest number of votes in each ward, shall be elected for four years, and the candidate who shall receive the next highest number in each ward shall be elected for two years.

Section 1, of Chapter 3776, appoints certain persons " Commissioners to divide the territory of the new city into nine wards for the purposes of the *first election* to be held after the passage of this act." This act was approved June 2, 1887, and by its fourth section it is "to take effect immediately after its passage." This section is amendatory

of, and in law, a substitute for section 3, of article IV, of the former chapter, which section, in its original condition, not only provided for a division, but also required the Commissioners named in it to certify their work to the County Commissioners within a certain time after the passage of the act, but this provision, as well as others, were omitted from the amendatory section, and are no longer a part of either statute.

Section 1, of article IV, which provided, as stated above, for an election on the second Tuesday in December, also prescribes that the voters shall vote by ballot, and the qualification of the voters, and what ward they shall vote in. "Every person entitled to vote for members of the Legislature, by the laws of the State, who shall have resided in the city for six months, and in the ward in which he offers to vote for thirty days next preceding the day of election, shall be entitled to vote, but only in the ward in which he resides. In case of removal of a voter from one ward to another within thirty days next preceding an election, he may vote in the ward from which he removed."

Section 4, of article IV, declares that " the general provisions of law governing elections held in this State, are made applicable to all elections under this act."

There are other provisions in the former of the two statutes as to elections, including *inter alia* the registration of voters, the appointment of judges and clerks of election, and the canvassing of returns, but they are clearly applicable to elections to be held in the future, and not to the one of December, 1887.

It is now necessary to state the proceedings taken for holding the election, and how the same was conducted and its result.

On the 20th day of June the Commissioners named met in the city of Jacksonville and proceeded to divide the ter-

ritory of the new city into nine wards, in accordance with the statute, and having made the division and described the limits of each ward, and designated them by numbers from 1 to 9 respectively, they resolved that six original copies of the report giving such division, certified by the Commissioners, be delivered as follows: One copy to the Board of County Commissioners of Duval county, one to the City Council of Jacksonville, one to the town Council of LaVilla, and one to the Chairman of the Council of the town of Fairfield, one copy to be posted at the door of the Court House of Duval county, and one copy for record in the office of the Clerk of the Circuit Court of such county, together with the minutes of the proceedings of the Commission. This resolution was carried out, and, in addition thereto, the description of the wards was published in the daily papers of the city of Jacksonville.

It is also a fact that the several wards, as defined or marked out, taken into their numerical sequence, correspond to election districts Nos. 15, 16, 17, 18, 19, 20, 21, 22 and 23 respectively, of the county of Duval, as previously defined and marked out by the County Commissioners of the county and published according to law in the newspapers of said city.

On the 5th day of December, 1887, the Aldermen of the old city of Jacksonville held a meeting, at which the President of the Council stated that the meeting was called to consider some official action in the matter of calling an election under the new city charter, and they passed a resolution reciting that "it seems to be the desire of a majority of the citizens of. the enlarged territory of the new city of Jacksonville to hold the election under the new charter," and resolving "that the election be and the same is hereby called to be held on Tuesday, December 13, 1887, at which election one Mayor and eighteen Aldermen shall

be voted for." It then designates the voting places in the respective wards in their numerical sequence. These places are the same as designated by the County Commissioners as polling places for the election districts of the county. It then declares that three inspectors and one clerk of election shall hereafter be appointed for each precinct; and directs that the resolution be published in the city papers until the day of said election; and that certified copies of the same be transmitted to the city governments of LaVilla and Fairfield and the County Commissioners, with the request that they join with the City Council in this election.

At the same meeting a resolution requesting the Supervisor of Registration of the county to furnish the Council with a certified copy of the registration lists of the nine wards of the city was adopted.

On December 8th the council passed another resolution reciting that "an election has been called for December 13th, and the polling places for the nine wards named in pursuance of the act of the Legislature of 1887, establishing the municipality of Jacksonville, etc., and appointing three 'judges' or 'inspectors' and a clerk for each ward." This resolution instructs such "judges" and clerks to hold the election at the polling places " heretofore named and published," and provides that " the clerk and the majority of the said judges of election for each ward shall ascertain, certify and authenticate the result and transmit the same to the present Mayor of the city of Jacksonville, who shall deliver such returns as they are received by him, to the present city clerk, who shall enter them in a book, and when he shall have ascertained the result by adding up the returns, shall issue a certificate of election to each person elected."

The resolution also adopts the registration lately made

by the Supervisor of Registration of the county, under an order of the Board of County Commissioners, where the voters of the respective wards have been separately registered, as the registration of voters for said election, and provides that certified copies of the registration list of each ward shall be furnished the judges at each polling place, and that the qualification of voters, and their place of voting, shall be the same as that prescribed by section 1, of article IV, and that a person whose vote is challenged on the ground that he resides in a different ward from the one in which he proposes to vote may vote upon taking oath that he removed his residence from said ward within thirty days next preceding said election; and directing that this and the preceding resolution of December 5th, be published *daily* in the three city papers, naming them, until the election, and that the City Clerk attach the same to the registration list of each ward on the day of election for the government of the judges and clerks of election.

The resolutions were published in the three daily newspapers as directed, the publication being headed, " NOTICE OF ELECTION," and stating that they were adopted at the stated meetings of the City Council of the city of Jacksonville.

On the said 13th day, or second Tuesday, of December, the people proceeded to hold the election at the places and for the officers named. At each polling place two of the inspectors, appointed as such by the above resolution of the City Council, acted, and another or third person was selected by the voters of the ward assembled at the polls to act with them, the remaining person designated by the resolution having either declined to act, or not being present at the election; and at each polling place the inspectors so appointed and selected chose a clerk; in two of the wards

the person named by the resolution was selected, and in the other wards a different person.

The polls were opened at the usual and legal hours for opening polls, and were closed at sunset, and during the day the said inspectors and clerks, in their several wards, supervised and conducted the election fairly and properly.

On the closing of the polls at sunset the inspectors canvassed the votes cast in their respective wards for Mayor and Councilmen, and the result thereof was certified and announced.

The precinct or ward returns are signed by the inspectors and clerk, and state the names of the persons voted for for Mayor and for Councilmen, and the number of votes cast for each person for such offices. In each ward Charles B. Smith and Frank W. Pope were voted for as Mayor, and in one ward still another gentleman was the subject of a similar honor. From three to six persons were voted for as Councilmen in the several wards.

After the votes had been counted and canvassed by the judges in and for the several wards, the returns were transmitted by them to John Q. Burbridge, the Mayor of Jacksonville, he being the person designated by the resolution of December 8th, to receive the same.

It further appears that on the 14th day of December, at a regular adjourned meeting of the Aldermen of Jacksonville, held at 9 o'clock A. M., pursuant to the last adjournment, the inspectors and clerks of election for the nine wards, reported that in accordance with their resolution they had " tendered to the City Clerk the returns of election, together with the ballot boxes used thereat, and that, the City Clerk being absent, the Deputy Clerk declined to receive, and declared that they had been ordered not to receive the said returns and ballot boxes;" and they further report " we therefore remained in charge of our returns

over night, and would now beg that your honorable body would make provisions for relieving us of our duty and responsibility as inspectors, without delay."

A resolution was then adopted by the Council requesting the inspectors and clerks of the election to come together at once and tabulate the returns, declare who are elected, and issue a certificate to each person elected, such certificate to be signed by a majority of such inspectors and clerks. The proceedings of the Council state that " a copy of the returns of election from the nine wards were handed the Clerk by the Mayor, and, on motion, the Clerk was instructed to take charge of the ballot boxes and deposit them in a place for safe-keeping," and that, on motion, the Council chamber was placed at the disposal of the inspectors to deliberate and make their returns as per above resolution.

The information alleges that the returns so delivered by Burbridge, Mayor, were those he had received from the inspectors.

In pursuance of the instructions embodied in said resolution, the judges and clerks of election canvassed and tabulated the precinct returns, and did certify the result of said election to be as is hereinafter stated, and they show who were voted for for Councilmen in the several wards.

The result of the election the inspectors and clerks certified to be that C. B. Smith was elected Mayor, and the following persons were elected Councilmen: J. W. Archibald and D. E. St. John, for the 1st ward; Benj. Wright and C. M. Vaught, for the 2d ward; Emanuel Fortune and W. H. McCormick, for the 3d ward; D. U. Fletcher and Philip Walter, for the 4th ward; William Clarke and C. R. Bisbee, for the 5th ward; S. M. Davis and T. J. Boyd, for the 6th ward; J. H. Stephens and P. E. McMurray, for the 7th ward; J. E. Spearing and S. Wiggins, for the

8th ward, and D. T. Gerow and N. Webster, for the 9th ward; and the number of votes which said persons are certified to have received are the same as the number shown by the precinct returns. Charles B. Smith received an aggregate of 2,394 votes, and Frank W. Pope 736 votes. It is unnecessary to recapitulate the number of votes received by different persons for the office of Councilmen.

A certificate of his election as Mayor, signed by the inspectors and clerks of the several precincts, was delivered to said C. B. Smith, it stating the number of votes received by him, and the number received by Mr. Pope, and a certificate of election signed by the inspectors and clerk of each precinct was made and delivered to the Councilmen elected therein.

On the 15th day of December, A. E. McClure, City Clerk of said city, canvassed the returns, and, as the result thereof, certified that said Smith was elected Mayor, and that the said parties above mentioned as having been elected Councilmen, were elected as such, and he issued to said Smith, and to said other parties, certificates of their election as Mayor and Councilmen respectively.

The minutes of an adjourned meeting of the City Council, held on the same day at 4 o'clock P. M., show that the " result and returns " of the election had and holden in and for the city of Jacksonville, county of Duval, State of Florida, on December 13, 1887, in pursuance of the laws of said State in this case made and provided, and a resolution of this Council passed December 8, 1887, having been first read of record, as provided, the certificates of election having been duly issued by the City Clerk, in accordance with the returns of the judges and clerks of said election, the following formal demand was made upon the Mayor

and Council in open session. Then follows a formal demand by Smith upon Burbridge of the office of Mayor of Jacksonville; and a formal demand by the Councilmen elect upon the Aldermen of the offices of Councilmen, such demands stating the election and qualification of such defendants, which latter demand, the minutes state, the Aldermen denied, because they were not satisfied in all respects the election was regularly and legally conducted.

The information states that Mayor Burbridge was requested to announce the result of said election, but refused to do so, and further states that the Mayor and Councilmen elect took the official oaths required by law. There is no denial of these statements.

The Councilmen elect reside in the wards for which they are elected.

The other facts are stated in the opinion.

*Fleming & Daniel* for Relator.

*Fletcher & Wurts* and *Call & Jones* for Respondents.

Mr. Justice Raney delivered the opinion of the court:

The constitutionality of the Jacksonville Charter Act, Chapters 3775 and 3776, Laws 1887, was affirmed by this court in the case of State *ex rel.* vs. County Commissioners of Duval County, decided last November.

Considered with reference to the election held on the 13th day, or second Tuesday, of December, for Mayor and Councilmen of the new city, it is plain, as shown by the preceding statement of the case, that these statutes, by their own provisions, definitely fix certain things concerning that election, viz: 1st, the day for the election to be held; 2d, the offices to be filled or officers to be elected;

3d, the qualification of the voters, including the wards in which they shall vote. As to these wards it is also clear both that the second of the above chapters made provision for the division of the territory of the new city into wards for the purpose of such election, and that such division was made promptly by the Commissioners named in the act, (this having been done nearly six months before the election day in question,) and that the boundaries or descriptions of the nine wards were given full publicity.

In addition to these provisions it is also to be observed that while the effect of section 4, of article IV, of the former of the two chapters—" the general provisions of law governing elections held in this State are made applicable to all elections under this act "—is not to adopt as polling places in city elections those established by county authorities under the general election law in the same territory as polling places for county or State elections, or to impose upon State or county officials duties appertaining to the appointment of inspectors or canvassing the returns of a municipal election, still its effect is to make the general provisions of the State election law, in so far as they are not inconsistent with the provisions of the above charter acts, applicable to the election in question.

Some, at least, of the general provisions of law governing elections held in this State, which are thus made applicable to the municipal election in question, or other elections under the charter acts, are that directing that the inspectors or judges of election shall represent, if practicable, two political parties; that authorizing the voters present at the polls at the time for opening the election to choose *viva voce* from their number inspectors in the place of such of those previously appointed as are absent or refuse to act, and authorizing the appointment by the acting inspectors of an elector as clerk in case the regular appointee is ab-

sent, and prescribing the oath to be taken by the inspectors and clerk, and that one of the inspectors shall be chairman of the board ; those prescribing the time for opening (8 o'clock A. M.) and closing (sunset) the polls, and authorizing an adjournment for half an hour between 12 and 1 o'clock, and proclamation of the opening, closing and adjournment, and the keeping of the ballot box during the election ; and who may be admitted inside the polling place, and regulating the conduct of persons so admitted ; those prescribing the ballot paper and what shall be on it, and the manner of voting, and those defining the authority of the inspectors to maintain order at the polls, and the power and duty of the sheriffs, constables and other persons in the premises, and those imposing penalty upon any officer or his deputy refusing to obey the lawful orders of the inspectors ; those closing bar-rooms and other places retailing liquors for thirty-six hours ending at 6 o'clock A. M. on the day after the election and imposing a penalty for violation of this provision ; and those regulating the canvass by the inspectors, including the provision as to the course to be pursued when there are more ballots found than there have been voters, and when two or more ballots are found folded together, and directing proclamation of the result of the election by the inspectors ; but not those as to making returns of the election, for there are special provisions in Chapter 3775 regulating this matter as to all future elections in the new city. The above provisions are all necessary to the holding and to the successful operation of elections and are clearly within the provisions of section 4, of article IV, quoted above, and they applied to the election under discussion.

In view of the above provisions of these statutes, and the actual division of the territory of the new city into the

nine wards, the first deficiency of any moment pointed out is, that though it is expressly provided in what ward a person must vote, still the precise place in such ward for voting is not prescribed, nor is the duty of fixing this place in such ward imposed upon any existing municipal, county or State official or particular person or board of persons.

If the failure of these municipal statutes to either designate the polling place in the ward, or to impose upon some existing official or particular person or board of persons the duty of doing so, renders them inoperative, then the election held in December was of no effect, and there has been no legal election and qualification of the officers of the new corporation, and, consequently, the juncture at which respondents' functions were to cease has not been reached, and this is an end of the case.

Both the time and place of holding an election must, it is contended, be definitely provided for, or the statute will be inoperative. The facts of this case remove from it any issue as to time, for if there is an authority that holds that any further notice of the time of an election for filling a new office, or an old one for an entire term, than that given and required by the statute fixing the time, such authority, in view of the unquestionable law to the contrary, may well be left unnoticed. The conflict existing in the decisions as to the necessity of such notice to the legality of an election of which there is actual notice and a fair expression of the popular will in the case of a vacancy by death or resignation in an existing term, and the law fixes the time for filling it, need not be considered. The authorities may be said to be about unanimous upon the point that in the former case the failure to give the notice, even where it is provided that one shall be given, does not defeat the election. Where the statute itself provides the time for

the election to fill an office for an entire term, the people are charged with notice of this time.

The contention as to place is narrowed by the facts of this case, to the point that a statute authorizing the voters of a ward to hold an election is inoperative unless, by its terms, it fixes the particular spot in the ward where they may cast their ballots, or grants the power and imposes the duty of designating such place upon a particular officer or officers, or person or persons other than the body of voters. This idea put in another form of expression is that a statute which provides for an election, but leaves to the voters of a ward or of a city the power to fix their polling places is on account of such provision inoperative. It is inoperative, if at all, not that it violates any provision of our State or National Constitution, but because the act or function in question cannot be so performed by the people as to secure a fair expression of the will of those entitled to vote for the officers to be chosen at the election. In the absence from a statute of express provisions for fixing the polling places, it can, of course, not be said that any law has been violated by the voters in themselves fixing such places, and if the places have been fixed by the voters, or by others for them at their request, and they have voted at such places as fixed, and the result of their votes has been ascertained, it is likewise clear that no law has been violated, nor has an election been held contrary to any provisions of law.

Whenever a power is given by statute everything necessary to the effectual execution of the power is given by implication. The failure of a statute to declare the mode of proceedings does not defeat its purpose. This doctrine has been applied by this court to statutes relating to the judicial and executive departments respectively. Mitchell vs. Maxwell, 2 Fla., 594; State *ex rel.* vs. Gleason, 12 Fla.,

209 ; *Ex parte* J. C. H., 17 Fla., 362 ; *Ex parte* Wells, 21 Fla., 280, and cases cited.   Why it should not be applica‑ ble to a statute providing a municipal government for a community, and authorizing an election, and specifying as many details of the election as these statutes do, including what they adopt of the general election law, we are unable to perceive where the voters of a defined locality are given power to hold an election at a certain time for certain offi‑ ces and there is in the statute an omission of the kind sta‑ ted, the meaning of the statute still is that the voters of such community shall themselves fix or have the place fixed, or themselves supply or have any omission as to details supplied, and if by their action they show that the act of fixing such place or supplying other details not specified was their act or has received their sanction, neither their power or ability to do it, nor the fact that they have done it, is to be questioned.   That they have the power to do it is plain, and that they have done it is a full answer to the assertion or pretension that they cannot manage such de‑ tails.   The grant of power to do a thing is not to be de‑ feated by the omission to prescribe some of the details for doing it, and unless we find the law upon this point has been otherwise adjudicated, the fair expression by the people of their choice for officers at a time expressly fixed by law is not to be annulled by courts for the mere fact of such an omission, but it is a duty to enforce such expression of the popular will where the elections have been free and fair, and the result thereof is clearly ascertained.

A review of the authorities relied upon by counsel for respondents is proper, considering the importance and nov‑ elty of the case.   In People vs. Knight, 13 Mich., 424, the polls of Pontiac township were held in the city of Pontiac, the territory of which city at the time of the election was

not a part of the township. Under the law controlling the election the polls should have been held in the township, and the votes of the township cast in the city were held to be illegal. In Dickey vs. Hurlburt, 5 Cal., 343, the point in question was the constitutionality of an act conferring upon a judicial officer the power of designating the place and manner of holding an election for a county site, and it was held that the statute was unconstitutional, and that as the whole result of the election depended upon the legality of his acts, the election was of no effect. Melvin's Case, 68 Penn. St., 333, decides that the holding of an election at a place fixed by law is essential to the validity of the election. The election was not held at either of the places fixed by law or by the Court of Quarter Sessions under the law, but at other and entirely different places from those fixed by law, or by the action of the court. The opinion recognizes an exception to the rule in cases of absolute necessity, such as the destruction of the building designated. Judge Dillon, in section 194 of his work on Municipal Corporations, cited by counsel, says that " where the law fixes no time, but leaves the time to be fixed by some authority named in it, after the happening of some condition precedent, it is essential to the validity of the election that it be called and the time and the place thereof fixed by the very agency designated by law and none other; as when the mayor and city council are the designated authority, neither the mayor alone nor the council alone has power to call such an election; if either neglect his duty mandamus is the remedy.

In the adjudicated cases cited above from Michigan and Pennsylvania it is clear that there was a positive violation of statutory law as to the place where the election should be held ; in the case from California the real point involved

did not concern the point now under discussion; and as to the section cited from Judge Dillon's work, it is only necessary to say that the case we are dealing with is not one where the law fixes no time, or leaves it to be fixed, nor one where the law has designated one agency to fix either the place or time, and it has been fixed by another agency. There is nothing in these citations that either decides or intimates an opinion that the power given to the voters of the territory in question to establish in each of the designated wards a polling place is either an unconstitutional or an inoperative power. To the diligence of counsel we have added a careful search of the books at our command, but with the same result.

This charter act is not altogether isolated or anomalous in our municipal legislation as to the power and duty thus devolved upon the voters of a community which it is proposed to incorporate into a municipality. The general law for the incorporation of cities and towns now in force in this State (Chapter 1688, approved February 4, 1869) provides that whenever any community having the requisite number of qualified voters, shall desire to form a municipal corporation, they are to publish in a newspaper or by posting for a period not less than thirty days, a notice requiring all persons who are registered voters residing within the proposed corporate limits, to assemble at a certain time and place and to organize a municipal government and select the officers thereof, and at the time and place designated in the notice, the qualified electors present, being not less than two-thirds of those whom it is proposed to incorporate, are to elect a corporate name and seal, and designate the territorial limits, and choose by vote a mayor, not less than five aldermen and a clerk and a marshal. It has never been suggested that this act, which has now been

in practical operation for nineteen years, is either unconsti-
tutional, inoperative or impracticable. It devolves upon
the voters of the community the power and duty of fixing
both place and time of meeting, to elect their officers, and
to do other things specified. Numerous municipal corpo-
rations have been successfully formed and now exist under
it. The functions it thus assigns to the mass of the voters
are no less complex than those devolved by the statute in
question, and had the Legislature of 1887 seen fit to simply
repeal the existing charter of the former city of Jackson-
ville, as it might have done, the people within the terri-
torial limits of the new city might have incorporated
themselves into a city under this general law.

The disposition and the duty of courts are to sustain
popular elections whenever they have been free and fair,
and it is clear that the voters have not been deprived of
their right to vote, and the result has not been changed by
irregularity. In State vs. Calhoun, 61 Miss., 556, there
had never been a formal designation by competent author-
ity of the voting places in the precinct, but without such
designation, Dogwood Flat Church had for years, by the
action of those participating in elections in such precinct,
been the polling place. Several months before the election
of 1883 the house was removed to a point three-quarters of
a mile from its former site and erected there by general con-
sent of the neighborhood, and it was still called by its former
name, and was used, as it had been before, for public assem-
blies and holding justices' courts. "The election of 1883,"
says the court, "was held in Dogwood Flat Church at its
new site, and it does not appear that any elector was at
any loss to ascertain where the election for that election
district was being held, or was prevented from voting be-
cause of a change of the place at which the polls were

opened," and the election as held was decided to be legal. In Farrington vs. Turner, 53 Mich., 27, the irregularity relied upon as avoiding the election was, that the supervisor and justice of the peace met at the school house in district number one, and organized as inspectors of election, and, without receiving any votes at that place, adjourned the election to the school house in district number two, in the same township, and on doing so announced the fact publicly to all present, and left a proper person at the former place to notify all electors who came there to vote, of the change. The change was made in good faith by the inspectors, they believing they had the authority to do so, and was not made to deprive any elector from voting, but for the purpose of accommodating a large number of voters. District number one was in the southeast corner of the township; the township consisted of the territory of two surveyed townships, and the districts were about eight miles apart. Several voters objected to the change, and two did not vote because of it, but it did not appear that any others neglected to vote on that account, or that those who staid away would have voted for the relator if the change had not been made. The voting at number two was conducted in an orderly manner. The election there was held to be legal. See also Dale vs. Irwin, 78 Ill., 170.

Not only is it a fact that no law has been violated, nor any regulation of law departed from in the appointment of the polling places in the several wards, but it is also satisfactorily shown by the record that proper measures were taken to inform the public as to the same. The resolutions of the old Council of Jacksonville calling the election recites " that it seems to be the desire of the majority of the citizens of the enlarged territory to hold the election under the new charter," and it is alleged by relators and

must be taken as admitted by respondents upon the record before us, that the action of the Council as to the election was taken at the request of the people of the city. An election to be held on the day named in the statute for the officers named was formally called, and polling places were formally and intelligibly designated in and for each of the previously defined wards, and inspectors and a clerk appointed for each polling place, and the resolutions were published in the three daily papers of the city. It is admitted that nominations were made for Mayor and Councilmen to be voted for at the election, and were duly made known and published to the people daily for many days prior to the day of election through the daily newspapers of the city, and it was generally understood, recognized and known by and among the people that the election would be held at the places and day mentioned, for one Mayor and for two Councilmen from each of the nine wards.

In view of the failure of the statute to charge any particular officers or persons with the duty of designating the polling places, and naming the inspectors, it was, we think, exceedingly apt in the mass of the voters to invoke the agency of the City Council of the principal municipality of the territory covered by the new city, to perform this function for them. Though it might have been done otherwise, it could hardly have been effected with greater semblance of official authority, or in a manner more likely to command immediate notice by all persons in the community.

The fact that the places adopted for voting were the legally established and duly advertised county polling places was calculated to acquaint the electors more readily with the locality in which they were to vote.

Considering the facts enumerated above, and the number

of votes actually .polled, to be noticed hereafter, there is no room for the contention that the place of election was at all uncertain.   As a matter of fact it cannot, in view of the admitted statements of this record, be said that the place of election ever was more certain, or the time for it more definitely fixed.

It is urged that no manner of calling an election is provided for so that the voters could be authoritatively informed of the holding of the same.   The city of Jacksonville, says the brief, assumed to make this call, in order to give it more significance, and bring out the vote, but there was no law for their doing so, and it did not add to the legality of the election.   The authorities cited in support of this objection are: Stephens vs. People *ex rel.*, 89 Ill., 339, and Clark vs. Board Supervisors, 27 Ill., 310; Dillon on Municipal Corporations, section 197, and Cooley's Constitutional Limitations.   The doctrine of the former Illinois case is, that where the time and place of an election are fixed by law, an omission to give the proper notice of the election will not vitiate the election held at the time appointed by the law, but when the law fixes no time or place the doctrine announced is the same as that set forth in section 194 of Judge· Dillon's book, and it was held that a Mayor alone had no power to call an election which the statute provided should be called by the Mayor and the City Council.   The other Illinois case was one involving the legality of an election upon the issue of county bonds; its doctrine is that an election held without warrant of law or ordered by a person or tribunal having no authority, would be void; but that an election held by order of the proper authorities, and in the main conforming to the requirements of the statute, but wanting in some particulars *not essential to the power to hold it,* and acquiesced in by the

people and approved by their agents, would make the bonds binding in the hands of innocent holders. The section (197) from Dillon is, in so far as applicable to the question before us, to the effect that elections fixed by law at a certain time and place may be legally holden, although notice has not been published or given ; but if the time be not defined by statute and is to be fixed by notice, the notice required is imperative. Time and place are said by it to be "generally essential, but many of the details as to the conduct of elections are usually regarded as directory." "Where, however." says Judge Cooley, in his Constitutional Limitations, "both the time and place of an election are presented by law, every voter has a right to take notice of the law and to deposit his ballot at the time and place appointed, notwithstanding the officer, whose duty it is to give notice of the election, has failed in that duty. The notice to be given is only additional to that which the statute itself gives, and is prescribed for the purpose of greater publicity ; but the *right* to hold the election comes *from the statute*, and *not* from the *official notice.*"

In view of the facts of the case before us these authorities either sustain our conclusion that the election was valid, or at least are not inconsistent with it.

II. What we have said above as to the implied power to designate the polling places, is true of both the power to appoint inspectors, and the advisability of the agency used for such purpose. The fact that in each ward at least one of the inspectors failed to act, and in some of them also the clerk, and that the electors assembled at the polls, elected a third inspector to act with those selected by the City Council, establishes more firmly the legality of the inspectors, and of the clerks as chosen by the boards of inspectors thus constituted ; and their conduct of this election

in accordance with the general provisions of law, as the same are shown above to have been applicable to it, removes all cause for questioning the legality of the election, considered with reference to the inspectors and their reception and counting of the ballots.

The authorities cited as to the inoperativeness of these municipal statutes in not expressly naming, or providing a method for naming inspectors and clerks, are Cooley's Constitutional Limitations, (4th edition,) p. 778; ibid, (5th edition,) pp. 776-7; Dickey vs. Hurlburt, 5 Cal., 343.

Judge Cooley, in speaking on the pages referred to, of "the conduct of elections," remarks that the statutes of the different States point out specifically the mode in which elections shall be conducted, and that, although there are great diversities of detail, the same general principles govern them all. He then proceeds to discuss the consequence of irregularities in the conduct of the election as tested by the provisions of the statute controlling it. Election statutes, he says, are to be tested like other statutes, but with a leaning to liberality in view of the great public purposes they accomplish; and except where they specifically provide that a thing shall be done in the manner indicated, and not otherwise, their provisions designed merely for the information and guidance of the officers must be regarded as directory only, and the election will not be defeated by a failure to comply with them, providing the irregularity has not hindered any who were entitled, from exercising the right of suffrage, or rendered doubtful the evidences from which the result was to be declared.

The point really involved in the case of Dickey vs. Hurlburt is accurately shown in a former paragraph of this opinion.

There is nothing in either of the above authorities to the

effect that the omissions complained of render the statute before us inoperative. Judge Cooley's discussion is of the effect of a departure from, or violation of, the provisions of a statute by election officers.

III. There were, it is urged, no means of determining the qualified voters, or in other words, no registration of voters. The statutes in question do not require a special registration of voters in the limits of the new city for the purposes of this election. There is nothing in the present Constitution to the effect that a municipal election cannot be held without there being a separate registration of electors by either city or county officers for the purpose of such an election. Assuming that registration in the county books is an essential to voting at the election in question, neither the Constitution nor the statute before us requires any other registration in connection with such election. Though under section 1, of article IV, of the charter act, it will be the duty of the Council of the new city to provide for a municipal registration, and registration in accordance with the rules it may lawfully prescribe will be necessary to entitle one to vote at future elections, no such registration was an element of the qualification of an elector at the election in controversy. In the case of State *ex rel.* v. Albin *et al.*, 44 Mo., 346, the facts were that the statute required positively that there should be a registration before each election, and there was none; and the court held such registration to be a prerequisite to an election and that without the election was invalid.

It is not pretended that any one voted at the election who did not have the qualifications of an elector prescribed by the above mentioned section of the charter act in so far as it is applicable to this election.

IV. It is a fact, as urged by counsel for respondents, that

no board is provided by the statutes to whom returns should be made by the inspectors of the several wards or polling places, and by whom they should be canvassed and the result of the election, as shown by them announced, or to whom the ballots and boxes should be delivered.

There is nothing in the authorities cited, viz: Cooley, 4th edition, p. 785, and State *ex rel.* v. Schnierle, 5th Rich., 302, to the effect that such a deficiency renders the statute inoperative or the election illegal. Judge Cooley remarks that if the election is purely local the inspectors who have charge of the election canvass the votes, and declare the result; and if on the other hand their district is one precinct of a larger district, they make return in writing to the proper board of the larger district, and he then proceeds to discuss the powers of canvassers, which are, as is well known, ministerial in their character. It is evident that his remarks are simply an observation of the ordinary provisions made by statutes for inspectors and canvassing boards and they convey nothing as to the legal effect of the absence of provisions for a canvassing board. The South Carolina case is not in point.

Under the statutes it was the duty of the inspectors in the several wards to canvass and announce the votes or result of the election at their respective polling places, as shown by the ballots cast. This they did, making written certificates or statements of the result of the election. If the result of the election shown by these certificates is the true result (and that it is, is admitted here), can it be said that the omission of the statute to provide a distinct board to add these returns or certificates together is to defeat the election? There is no merit in such a position. Nothing is plainer than that, if there had never been any admission of the kind, the certificates of canvass, if not of themselves,

yet supported by the testimony of the inspectors and clerks, as to the canvass and truthfulness of such certificates, would, upon an issue, have been satisfactory proof of the result of the election, and the addition of the votes of the several wards would be as much within the province and duty of a court in ascertaining the result as to the election of Mayor as would be the addition of the prices in a bill of merchandise in an ordinary suit.

V. Considering all the circumstances of this election, we see that no fraud or unfair dealing upon the part of any one is even charged, or appears to have been committed, no illegal vote appears to have been cast, nor has any elector been deprived of his right or of an opportunity to vote, the time and the places of the election were certain, fully made known, and well understood, the participation in the election has been general, the result of the vote as cast is definitely ascertained ; the officers elected have taken the oaths prescribed by law.

There is nothing wanting to make the election valid, and our conclusion is that the relators are entitled to exercise the offices to which they were respectively elected under the new charter in December last. The juncture at which the functions of the respondents as officials of the old city of Jacksonville were to cease has been reached, and judgment of ouster must be rendered against respondents as such.

Judgment will be entered accordingly.