WILLIAM B. PICKETT, AS TAX ASSESSOR IN AND FOR DUVAL COUNTY, APPELLANT, VS. G. W. RUSSELL APPELLEE.

1. Equity has jurisdiction to enjoin the assessment and collection of an illegal tax levied upon real estate, which if assessed or collected, will cast a cloud over the title to such real estate, and where such levy to be valid must be authorized by the result of an election previously held, the court of equity has jurisdiction, in the absence of other remedies at law, to inquire into the validity of such election in so far as the authority levy and collect the tax is derived therefrom.

2. Section 8, Article IX, Constitution of 1885, does not require taxes legally assessed to be paid as a pre-requisite to the institution of proceedings for relief against illegal taxes, but only that such payment must be made before the applicant for

relief is relieved from the illegal tax. If it is made to appear to the court that any tax is due by the applicant which it is his duty to pay before obtaining the relief sought by his application, the court should afford the applicant an opportunity to pay the tax legally assessed; and if not paid as required dismiss the application for relief against illegal taxes.

3   The trustees of a school district organized under sections 10 and 11, Article XII, Constitution of 1885, and Chapter 4336 laws, approved May 20, 1895, ought to be made parties defendant to a bill filed against the tax assessor of the county in which such school district is situated, to enjoin him from assessing a district school tax for such district alleged to be illegal, but the mere failure to make them parties does not necessarily require that a temporary injunction against the assessor, granted upon each bill, be dissolved bv an appellate court.

4.   An election held under the provisions of Chapter 4336 laws, approved May 20, 1895, to determine the millage to be assessed and collected for a school district, will not be declared void because a specified rate of millage was printed on the official ballots, when it appears that blank spaces or lines were left thereon for expressing a different rate by individual voters; that voters were not prohibited from changing the printed rate to any other rate desired, and that facilities for marking and writing on ballots by voters were provided at each polling place, and where it is not shown that any voter desired, or was denied the right, to vote for a rate other than that printed, and that the result of the election would have been different if such particular rate had not been printed on the official ballots.

5.   It is not essential to the validity of an election held to determine the rate of millage to be levied and assessed for a school district, that there shall have been a previous registration of the qualified electors of the district that pay a tax on real or personal property, as neither the Constitution nor any statute requires such registration. (Taylor, C. J., dissenting.)

6.   The provisions in Chapter 4336 laws, approved May 20, 1895, restricting the right to vote to those "registered and qualified voters" who are tax-payers on real or personal property refer to registration in the county registration books, and where a special election under that chapter is held intervening two general elections, the fact that the county registration books were not opened for registration immediately prior to the special election will not avoid the election, when it is not denied that they were duly opened for the preceding general election, and it is not shown that there were persons not registered but qualified to register therein who were tax-payers upon real or personal property in the school district; or where it is not shown that the result of the election could or would have been

different if the county books had been opened for registration for the special election.

7. The fact that inspectors of an election were furnished lists of registered voters not certified, instead of the original registration books or certified copies, when it is not denied that the lists furnished corresponded precisely with the original registration books, is not sufficient to avoid an election.

8. Where inspectors of an election held under Chapter 4336 laws, approved   May 20, 1895, were furnished lists   of registered voters corresponding with the county registration books, together with a list made by the county superintendent of schools showing the names of those persons on such list who did not appear by the tax books to be tax-payers on real or personal property in the district, and the inspectors refused to permit any person to vote except those whose names were on both lists, the election will not be held void in   the absence of a showing that a number sufficient to change the result lawfully entitled to vote were by the means mentioned denied the right to vote.

9. The rejection of votes from legal voters, not brought about by fraud, and not of such magnitude as to demonstrate that a free expression of the popular will has been suppressed, is not sufficient to avoid an election, at least unless it be shown that the votes rejected would have changed the result.

10. The delay of less than an hour in opening the polls, caused by the failure of the inspectors originally appointed to appear necessitating the selection of others in their stead, will not avoid an election where it is shown that only one person was prevented from voting by the delay, and it is not shown that his vote would have changed the result.

11. Where persons act as inspectors of election, are recognized by the electors as election officers, and make   returns as such which are duly canvassed, they are officers de facto and the election can not be declared void for a mere irregularity in the manner of their appointment.

12. Returns of elections held under the provisions of Chapter 4336 laws, approved May 20, 1895, are properly made to the board of public instruction, and such board has authority to canvass the returns and declare the result.

13. The fact that many ballots cast were improperly rejected by the inspectors as being erroneously marked will not avoid the election, unless it be shown that they were rejected fraudulently, or that the rejected ballots would have changed the result.

14. Chapter 4336 laws, approved May 20, 1895, is not inoperative because neither it, nor any other statute, provides a method, by registration, or otherwise, of ascertaining who are the qualified electors of a school district or proposed school district, paying taxes on real or personal property, and, therefore, en-

titled to vote at elections authorized by it. (Taylor, C. J., dissenting.)

15. The provision of Chapter 4336 laws, approved May 20, 1895, to the effect that it shall require a majority of the votes of those voting at an election called under that statute to determine any matter in the affirmative, is not, when applied to an election to determine whether a special district school tax may be levied, in conflict with that clause in section 10, Article XII, Constitution of 1885, which authorizes the Legislature to provide for levying and collecting a district school tax "whenever a majority of the qualified electors thereof that pay a tax on real or personal property shall vote in favor of such levy." (Taylor, C. J., dissenting.)

Appeal from the Circuit Court for Duval County.

## Statement.

On August 22, 1899, appellee filed his bill in equity in the Circuit Court of Duval county against appellant, alleging that on June 20, 1899, and at the time of filing the bill, complainant was a qualified elector of Duval county, residing in the city of Jacksonville and a taxpayer, paying taxes on real and personal property situated in said city; that on June 20, 1899, a pretended election was held in the several election precincts of Duval county which were within the corporate limits of the city of Jacksonville, to determine whether said division of Duval county should be a sub-school district; to elect three school trustees therefor and to determine the millage to be assessed and collected annually during the next succeeding two years; that A. E. Sawyer, J. C. Cooper and O. H. Hodgson claim to be such trustees elected at such election, and have filed a written statement with defendant setting forth the boundary of said sub-district and the rate of taxation to be levied on the real and personal property therein, and demanded that defendant assesses a tax of three mills upon the property

of complainant and others situated in said city for the
year 1899; that on August 17, 1899, the board of county
commissioners of said county made  an order levying
and directing defendant to assess an official school tax
of three mills upon the taxable property of said school
district, as determined by said election of June 20, 1899;
that unless restrained defendant will immediately assess
said special tax, attach his warrant to the assessment
roll and deliver same to the collector of taxes; that the
majority announced as in favor of the levy of said tax
at said election was twenty-three; that said election for
the imposition of said tax is null and void upon the fol-
lowing grounds:

1st. That the electors  offering to vote were re-
quired to vote an official ballot, restraining them to vot-
ing for or against a levy of three mills, a copy of said
ballot being as follows:

---

Vote for one.
    For Subdistrict and Three Mill Levy.
      YES
      NO

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Vote for three.
    For Subdistrict Trustees.
      J. C. COOPER.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      A. E. SAWYER.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      O. H. HODGSON.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2nd. That no registration books were made out for said election by any officer empowered by law to make them; that no opportunity was given to the qualified electors of said proposed sub-district who pay a tax on real or personal property to register for said election, and no deputy registration officer was appointed for each voting precinct prior to said election.

3rd. That the inspectors at the various polling places had no registration books or lists made by an authorized officer, but had printed lists made up and obtained as follows: That George P. Glenn obtained from the supervisor of registration of said county a book certified by him as "containing a list of all the registered voters in the several voting precincts in said city as the same appeared on the books in his office;" checked off the names of all persons on said book who did not appear by the assessment books of the city in the office of the city tax collector, to have property assessed to them, cut the leaves from the book so certified by the supervisor, made divers marks and annotations on the margin and furnished same to the inspectors as and for the registration books for said election, and that no person whose name was not on the lists or whose name had been checked off by Glenn was permitted to vote. Upon information and belief it was alleged that the city assessment rolls did not, at the time Glenn examined them; contain the names of all qualified electors in the city who paid taxes on real or personal property therein.

4th. That twenty-seven named persons "and many others," all of whom were qualified electors residing in said city and taxpayers upon property therein, offered to vote, and the persons conducting the election refused to receive their votes.

5th. That the polls at the fourth ward wherein the

majority for the tax was four, were not opened at 8:45 a. m.; in consequence whereof a named qualified elector and taxpayer who went to the polling place at about that time to vote lost his vote.

6th. Upon information and belief it was alleged that the inspectors who served at the fourth ward were not chosen as required by law, but were selected by said George P. Glenn.

7th. That the returns of said election were made to the supervisor of registration, and had ever since remained in his possession, and that they were canvassed and the result announced by said supervisor, the county judge and Wm. A. Bours.

8th. That many votes, the precise number being unknown to complainant, cast against the special tax were rejected because the voter made his mark on the right hand side of the official ballot, instead of on the left.

9th. Upon information and belief it was alleged that Henry Hart, P. Tischler and Thomas Jackson (three of the persons specifically named among the twenty-seven above referred to) and a number of others whose names were unknown to complainant, who were qualified electors, residents of and taxpayers upon property situated in Jacksonville, offered to vote at said election and their votes were refused on the ground that their names had been checked off the list of voters because they had paid no poll tax, and upon information and belief it was alleged that said three persons named were exempt from the payment of poll taxes.

10th. Upon information and belief it was alleged that no petition signed by one-fourth of the registered and qualified electors of the city who were taxpayers on

property therein, praying for said election, was present-
ed to the board of public instruction.

The bill prayed, among other things, that defend-
ant be enjoined from assessing on the taxable property
of complainant and the other citizens of Jacksonville,
situated in the city, a special school tax of three mills,
and from attaching his warrant to, or delivering to the
collector, any assessment roll for 1899 with any such
special tax entered thereon.

The Judge of the Fourth Circuit being disqualified,
the bill with certain affidavits was presented to the
Judge of the Second Circuit on August 24, 1899, who
made an order that a temporary injunction issue as
prayed. Thereafter, on September 14, 1899, defendant
filed his answer, the material portions being substan-
tially as follows: It admits that complainant was a qual-
ified elector of Duval county and a taxpayer upon prop-
erty within the city of Jacksonville; that an election was
held on June 20, 1899, as alleged in the bill; that Saw-
yer, Cooper and Hodgson claim to have been elected
thereat, trustees of a school sub-district composed of
the territory contained within the limits of Jacksonville;
that they had filed a written statement with defendant
setting forth the boundaries of said school sub-district
and the rate of taxation to be levied on the property
therein and demanded that he assess a tax of three mills
upon such property for 1899; that the county commis-
sioners of said county on August 17, 1899, made an or-
der directing defendant to assess a special school tax of
three mills as alleged; that the majority announced for
the special tax as the result of said election was twenty-
three; and avers that George P. Glenn was the duly
elected and qualified superintendent of public instruc-
tion of Duval county, and ex-officio secretary of the

board of public instruction of said county; and that Sawyer, Cooper and Hodgson were duly elected sub-district school trustees at said election. It denied that said election is null and void and the assessment of said school tax illegal, and as to matters specifically alleged in the bill as grounds for holding the election void: 1st. It admits that the copy of ballot set forth in the bill is a copy of the official ballot prepared for said election, but denies that voters were restricted to voting for or against a levy of three mills and alleges that while the words "three mills" were printed on the official ballots, it was competent for the voter to change the word three and substitute any other word therefor, or to use the blank line before to substitute any other rate therefor, and that facilities were provided at each polling place for the marking and writing on the ballots by all voters at such election.

2nd. It denies the allegation that no registration books were made out for said election by any officer empowered by law to make them; admits that no opportunity was given to voters to register for said special election except that provided by law for general city and county registration; avers there was no provision of law for special registration for said election, and admits that no deputy registration officer was appointed for each voting precinct prior to said election and subsequent to the appointments for the general election of 1898, and alleges that the law did not require such appointments.

3rd. It denies the allegation that the inspectors at the various polling places had no registration books or lists made by an authorized officer and alleges that the lists of registered voters furnished the inspectors were made out and certified by the Supervisor of Registra-

tion; that the whole list of registered voters in the city was so certified as a whole and that identical lists for each precinct were furnished the inspectors of such precinct. It admits that Glenn made a pencil check mark opposite the names of persons on the lists furnished by the supervisor to whom property did not appear to be assessed on the city assessment books; alleges that such mark was made as information to the inspectors for the purpose of challenging the vote of such person on the ground that he was not a taxpayer on property within the city; denies the allegation that no person whose name had been checked off by Glenn was allowed to vote, alleging that although checked and challenged for the reasons stated, such persons were allowed to vote on making proof that they were taxpayers on property within the city. It alleges that defendant is not informed as to whether or not the city assessment rolls at the time Glenn examined same contained the names of all qualified electors in the city who paid taxes on real or personal property therein.

4th. It alleges upon information and belief that of the twenty-seven persons who it was alleged offered to vote at the election and were refused, the name of one (naming him) was not on the list of qualified electors certified by the supervisor; that eighteen (naming them and including the one above referred to) on offering to vote were each respectively challenged on the ground that they were not taxpayers on property within the city, and were each informed by the inspectors that their votes would be received on proof that they were such taxpayers; that none of them offered or produced any such proof; that two (naming them) did not offer to vote, nor were their votes refused; that as to four (naming them) defendant is not informed as to whether

they offered to vote or whether their votes were refused, but alleges upon information and belief that all persons on the registration lists whose votes were challenged on the ground that they were not taxpayers in the city were given an opportunity and allowed to vote on making proof that they were taxpayers. It further alleges that defendant was not informed whether or not the persons mentioned in this ground of objection to the election were taxpayers on real or personal property within the city of Jacksonville, and requires proof thereof.

5th. It denies that the polls in the fourth ward were not opened at 8:45 a. m., and avers upon information and belief that they were opened at that time, admitting that there was a short delay in opening them caused by the failure of the inspectors originally appointed to act and the necessity of choosing other inspectors and organizing the new board, and alleges that there was ample time for all persons interested and qualified to vote at said precinct.

6th. It denies the allegation that the inspectors who served at the fourth ward were not chosen as required by law, or that they were selected by said Glenn, and avers that two of the inspectors at said ward were requested to serve by said Glenn because the inspectors originally appointed failed to appear.

7th. It denies that the returns of said election were not made as required by law, and avers that while certain of the returns were made to the supervisor and were canvassed by the supervisor, county judge and William A. Bours as chairman of the board of public instruction for Duval county, returns of such election were also made to the board of public instruction of said county, and they were duly canvassed and the result declared by said board.

8th. It alleges that defendant has no knowledge as to whether votes cast against said special tax were rejected because the voter made his cross mark on the right hand, instead of the left, and requires proof of such allegation.

9th. It denies that Hart, Tischler and Jackson were qualified electors in the city of Jacksonville, and that their votes were refused because their names were checked off the list of voters and that they were exempt from the payment of poll taxes. Upon information and belief it alleges that their names did not appear on the list of registered voters furnished and certified by the supervisor because they were not qualified voters by payment of poll tax required by law; that neither of them were qualified electors within the city of Jacksonville; that Hart and Tischler had not paid their poll taxes for 1897; that Jackson had not paid his poll tax for 1896, and that their names were not therefore on the list of qualified electors certified by the supervisor.

10th. It denies the allegation that no petition signed by one-fourth of the registered and qualified electors of said city, who were taxpayers on real or personal property therein, praying for said election was presented to the board of public instruction, and alleges the truth to be that a petition praying for said election signed by largely more than one-fourth of the registered and qualified voters within the city, who were taxpayers on real and personal property therein, was duly presented to said board of public instruction.

On September 26, 1899, the cause came on for hearing upon motion to dissolve the injunction previously granted, and at the hearing the answer was read and various affidavits and documentary evidence offered by the parties considered. The court denied the mo-

tion, and from the order refusing to dissolve as well as the order granting the injunction this appeal is taken.

The facts shown by the affidavits and documentary evidence, so far as deemed material, will be stated in the opinion.

The errors assigned are, in substance, first, the court erred in granting the temporary injunction; second, the court erred in denying defendants motion to dissolve the temporary injunction.

*Fleming and Fleming*, for Appellant.

*William B. Young*, for Appellee.

CARTER, J. (*After stating the facts.*)

Sections 10 and 11, Article XII, constitution of 1885 read as follows: Section 10. "The legislature may provide for the division of any county or counties into convenient school districts; and for the election biennially of three school trustees, who shall hold their office for two years and who shall have the supervision of all the schools within the district; and for the levying and collection of a district school tax for the exclusive use of public free schools within the district whenever a majority of the qualified electors thereof that pay a tax on real or personal property shall vote in favor of such levy; *Provided*, that any tax authorized by this section shall not exceed three mills on the dollar in any one year on the taxable property of the district."

Section 11. "Any incorporated town or city may constitute a school district. The fund raised by section ten may be expended in the district where levied for building or repairing school houses, for the purchases

of school libraries and text-books, for salaries of teachers or for other educational purposes, so that the distribution among all the schools of the district be equitable.''

Chapter 4336, approved May 20, 1895, so far as applicable to this case, provides as follows: Section 1. That an election may be held in any city under the order and direction of the board of public instruction of the county, upon the petition of one-fourth of the registered and qualified voters of such city, who are taxpayers on real or personal property therein, to determine whether such city shall be a school sub-district and for the election of three trustees therefor, and to determine the mileage to be assessed and collected annually during the succeeding two years. Such election shall be held and the result declared as nearly as practicable in the same manner as is provided by law for the holding of elections concerning Article XIX of the constitution, substituting the board of public instruction for the county commissioners. It shall require a majority of the votes of those voting at any such election to determine any matter in the affirmative. At an election to decide whether such sub-district shall be formed, three school trustees shall be elected to serve as such should a majority of the electors vote for and create such sub-district, and on the same day biennially thereafter and at each of such elections the mileage to be assessed and collected annually during the succeeding two years for school purposes in such sub-district shall be determined by a majority vote of the qualified electors as herein provided. Notice of holding any such election to determine whether such city shall be made a school sub-district or for the election of school trustees shall be made by the board of public instruction by publishing a notice, etc.

9

Section 2. All voters in such election for sub-districts or trustees shall have the qualifications specified in section 1 for petitioners for elections to establish sub-districts.

Section 4 requires the trustees, on or before the last Monday in July each year, to prepare an itemized estimate showing the amount of money required for necessary common school purposes of their sub-districts for the next ensuing scholastic year, stating the rate of millage to be assessed and collected upon the taxable property of their sub-district to cover such amount, not to exceed three mills on the dollar; provides that a copy of such estimate be filed with the clerk of the board of county commissioners, and requires that board to direct the assessor of taxes to assess and collector to collect the amount so stated, the moneys so collected to be paid over to the trustees.

Section 6 provides that trustees of such districts shall be corporations with the usual powers for the purpose of performing their duties; and section seven directs the disposition of moneys assessed and collected as provided by the act.

As will be seen by reading the bill filed in this case, the object is to prevent the assessment and collection of a special tax levied in pursuance of the result of an election held under the constitutional and statutory provisions above mentioned and other statutory provisions hereinafter referred to.

1. It is contended by appellant that the bill seeks to try the right of Sawyer, Cooper and Hodgson to the office of school trustees and the right of the territory included within the city of Jacksonville to exercise the powers incident to school sub-districts, and that equity has no jurisdiction to entertain a bill for these purposes.

We do not think the bill subject to the construction contended for. The relief prayed is an injunction against the assessment and collection of a tax levied, but alleged to be unauthorized. The legislature can authorize this tax to be levied and collected only when a majority of the qualified electors of the school district that pay a tax on real or personal property shall vote in favor of such levy. Proceedings for the levy, assessment and collection of the tax will cast a cloud over the title to the complainant's real estate sought to be subjected to the tax. Under these circumstances equity has jurisdiction to enjoin the assessment and collection of the tax if illegal, and to inquire into the validity of the election in so far as the authority to levy and collect the tax is derived therefrom. Smith v. Longe, 20 Fla. 697, text 699; Wilson v. Lambert, 168 U. S. 611, 18 Sup. Ct. Rep. 217. See also, Lanier v. Padgett, 18 Fla. 842.

II. It is also contended that under section 8, Article IX constitution of 1885, which provides that "no person or corporation shall be relieved by any court from the payment of any tax that may be illegal, or illegally or irregularly assessed until he or it shall have paid such portion of his or its taxes as may be legal, and legally and regularly assessed," the bill ought to have alleged that complainant had paid all taxes legally assessed against him for the year in which the levy of this special tax was made, and that without such allegation there is no equity in the bill. It does not appear that any other tax was in fact assessed against complainant's property during the year 1899, or at the time of filing the bill, though it is quite probable that the assessment roll for State and county taxes of that year was then being made up. We do not understand that the constitutional provision requires payment of taxes legally as-

sessed as a pre-requisite to beginning proceedings for relief against illegal taxes, but that such payment must be made before the applicant is relieved from the illegal tax, and such seems to have been the construction placed upon it in Town of Kissimmee City v. Cannon, 26 Fla. 3, 7 South. Rep. 523, and City of Tampa v. Mugge, 40 Fla. 326, 24 South. Rep. 489. If in fact any tax was due by complainant which it was his duty to pay before obtaining the relief sought by this bill, it does not appear upon the face of the bill, nor does it otherwise appear in the proceedings before us. If such was the fact the defendant would have a right to make it so appear to the court, and in that event the court should give complainant an opportunity to pay the tax legally assessed and dismiss the bill for failure to do so.

III. It is contended that the trustees of the school district, for whose benefit the tax sought to be enjoined was levied, ought to be made parties defendant. The statute constitutes these trustees a corporation with the usual powers for the purpose of performing their duties. This includes the power to sue and be sued in all proper cases, and as the school district is directly interested in the collection of the tax sought to be enjoined, we think its proper representatives, the trustees, ought to have been made parties defendant. The mere failure to make the trustees parties would not necessarily under the circumstances of this case require us to dissolve the temporary injunction granted against the assessor (Fairchild v. House, 18 Fla. 770; Morgan v. Rose, 22 N. J. Eq. 583), hence we proceed to consider other questions presented by the pleadings.

IV. We shall consider the grounds upon which it is claimed that the election was void, in the order mentioned in the bill.

1st.   If it be the law as claimed by the appellee that in elections of this character the voter must be left free to vote for any rate he chooses   not to exceed three mills, as a special tax in school districts, as to which we find   it unnecessary to   express   an opinion, we   see nothing in the form of the official ballot   prescribed in this case   that confined the voters to voting   for or against a three mill levy.   They might have changed the word three to any other rate desired, or they might have used the blank spaces or lines for expressing choice for a different rate.   The answer alleges and it is not denied that facilities for marking and writing on ballots were provided at each polling place.   It is not alleged, nor does the proof show, that any voter at the election desired to vote for any rate other than that printed on the official ballot, or was as a matter of fact denied the right to do so.   Even if the statutes regulating the election undertook to deny a voter the right to vote for a rate different from that printed on the ballot, and such provision was unconstitutional, in the absence of allegations and proof that the result of the election would have been different but for such unconstitutional   provision, we would not   be justified in holding   the election void. State *ex rel.* Attorney-General v. Dillon, 32 Fla. 545, 14 South. Rep. 383.

2nd.   Neither Chapter 4336, acts of 1895, nor the legislation regulating elections concerning Article XIX, to which it refers, nor the laws regulating general and special elections to which the latter refers, provide for registration of qualified electors who are taxpayers upon real or personal property.   Nor did the laws providing for and regulating the registration of qualified electors in force at the time this election was held, authorize the books to be opened for registration for spec-

ial elections, but only for general elections. It is true that Chapter 4336, act of 1895, authorizes only "registered and qualified voters" who are taxpayers on real or personal property in the city to vote at elections of this character. This refers to registration in the county registration books. It is also true that the bill alleges that the county books were not opened for registration for this special election, but it is nowhere denied that they were duly opened for registration for the general election held in the fall of 1898, and it is not alleged or proved that there were persons not registered but qualified to register, who were taxpayers upon real or personal property within the proposed district (except perhaps one person, Kappher), or that the result of the election could or would have been different, if the books had been opened for registration for this special election. In the absence of such a showing the election held must stand as against this objection, and we do not feel called upon to determine whether the legislature has power to direct the closing of registration books from a period just prior to one general election to a period just prior to the next succeeding general election, and to forbid any person not registered from voting at a special election held in the meantime.

3rd. It is not claimed that the lists of registered qualified electors furnished the inspectors at the various precincts were incorrect, or that they did not correspond precisely with the original registration books in the office of the supervisor. While it may have been irregular to furnish these lists, instead of the original registration books or copies applicable to the voting precincts included within the territory proposed as a school district, this irregularity did not and could not have affected the result of the election. It is also alleged that

no person whose name was not on the lists furnished the inspectors, or whose name was checked by the county superintendent as persons who did not appear by the city tax books to be taxpayers upon real or personal property in the city, were allowed to vote; but it is not alleged that a sufficient number to change the result were under the circumstances denied the right to vote. The election can not, therefore, be set aside on these grounds.

4th and 9th. Without deciding whether all of the twenty-seven persons "and many others" whose votes it is alleged were rejected were in fact entitled to vote at the election, but assuming that they were, we do not think the matters here complained of are sufficient to avoid the election. It is neither alleged nor proved that either of these persons would have voted against the tax but for aught that appears all of them may have voted for it. It is not claimed that any of these votes were fraudulently rejected; on the contrary, the evidence shows that the votes were rejected either because the parties did not appear by the city tax books to be taxpayers upon property within the city, or because they did not appear to have paid the requisite poll taxes to entitle them to vote, except two who did not offer to vote at all. It is shown by the evidence that the inspectors at the various precincts offered to permit every person whose name was upon the registration lists to vote upon proof that they were taxpayers upon real or personal property and that no such proof was offered by those whose votes were rejected upon challenges for such cause. The rejection of votes from legal voters not brought about by fraud and not of such magnitude as to demonstrate that a free expression of the popular will has been suppressed is not sufficient to avoid an elec-

tion, unless it be shown that the votes rejected would have changed the result. People v. Cicott, 16 Mich. 283, S. C. 97 Am. Dec. 141, opinion by COOLEY, J. Whether if it had been alleged that enough of these votes to overcome the majority for the tax, would have been cast against the tax if the persons offering them had been permitted to vote, the rule would be different. we do not now determine.

5th and 6th. It appears that only one person lost his vote by reason of the delay of less than an hour in opening the polls of the fourth ward. It is not alleged or proved that this person would have voted against the tax and even if he had his vote would not have changed the result. The delay in opening the polls is shown to have occurred by reason of the necessity for selecting and organizing a new board of inspectors, those originally appointed having failed to appear at the hour appointed by law for opening the polls. The new board was recognized by the electors as election officers, they acted in that capacity and made returns of the election that were duly convassed. They were, to say the least, officers *de facto*, and the election cannot be declared void for a mere irregularity in the manner of their appointment. State *ex rel.* Bisbee v. Board of County Canvassers of Alachua County, 17 Fla. 9; McCrary on Elections, §251; Meacham on Public Officers, §184.

7th. Chapter 4336, acts 1895, requires that elections like the one under discussion shall be held and the result declared as nearly as practicable in the same manner as is provided by law for the holding of elections concerning Article XIX of the constitution, substituting the board of public instruction for the county commissioners. By section 861 Rev. Stats. inspectors at elections held concerning Article XIX of the constitu-

tion are required to canvass the votes cast and to make due returns of the same to the county commissioners, and the county commissioners are required to canvass the returns and declare the result. Substituting the board of public instruction for the county commissioners, as required by Chapter 4336, acts 1895, it is evident that the returns of this election were properly made to the board of public instruction of Duval county, and that it had authority to canvass them and declare the result. The answer alleges and the proof shows that this was done and the legal effect of such canvass can not be changed by the fact that returns were made to another unauthorized board who also proceeded to canvass them.

8th. The allegation that many votes cast against the special tax were rejected because the voter made his mark on the right hand side of the official ballot instead of the left, even if it be conceded that ballots so marked were improperly rejected, is insufficient to avoid the election in the absence of a further allegation that they were rejected fraudulently or that enough ballots of that character were rejected to have changed the result. State *ex rel.* McClenny v. County Commissioners of Baker County, 22 Fla. 29. There is no evidence whatever upon this subject.

10th. The answer denies the allegation that no petition signed by one-fourth of the registered and qualified electors of the city who were taxpayers on property therein was presented to the board of public instruction, and the evidence shows affirmatively that a petition signed by more than the required number of persons qualified to sign it was presented to the board of public instruction as a basis for calling the election.

This disposes of the several matters alleged in the

bill as grounds for holding the election void, but there are two other grounds specially argued by counsel for appellee which we think properly arise upon the facts alleged in the bill.

V. It is said that because the legislature has failed to provide a method, by registration or otherwise, of ascertaining who are the qualified electors of the district paying taxes on real or personal property and therefore entitled to vote at the election, no election can lawfully be held, although the legislature has expressly authorized such election and made provision for conducting same, canvassing returns and declaring the result. Neither the constitution nor the statutes provide for a registration of those entitled to vote at an election of this character. It is not claimed that any person voted at the election who did not possess all the qualifications imposed by the constitution. If it be that the election officers are not empowered to determine who are and who are not qualified electors paying taxes on real or personal property in the district, the courts possess ample power upon proper proceedings to test the validity of the election, to inquire into the qualifications of those who voted or offered to vote. We do not deem it essential to the validity of an election that there should be a previous registration of those entitled to vote thereat, where not required by law. State *ex rel.* Smith v. Burbridge, 24 Fla. 112, text 136, 3 South. Rep. 869.

VI. It is also contended, and the parties state that the court below so held, that so much of Chapter 4336 as provides that it shall require a majority of the votes of those voting at the election to determine any matter in the affirmative is, when applied to an election to determine whether a special school tax may be levied, in conflict with the clause in section 10, Article XII of the

constitution, which authorizes the legislature to provide for levying and collecting a district school tax "whenever a majority of the qualified electors thereof that pay a tax on real or personal property shall vote in favor of such levy." The contention is that the constitution requires the affirmative vote of a majority of the total number of qualified electors of the district that pay a tax on real or personal property, to authorize the levy. If this contention is correct, the election held in this case is void, for it is shown by the bill and not denied by the answer that there were at the date of the election a number of qualified electors, taxpayers on property within the city in excess of the majority announced for the tax. There are a number of authorities sustaining this construction and the principal arguments in its favor may be obtained from the opinions in the cases of Chester and Lenoir Narrow Guage R. R. Co. v. Commissioners of Caldwell Co. 72 N. C. 486; Hawkins v. Board of Supervisors of Carroll Co. 50 Miss. 735; State *ex rel.* Woodson v. Brassfield, 67 Mo. 331. The weight of authority, however, sustains the view that under constitutional or statutory provisions substantially like the language of our constitution it requires only a majority of the votes of those taxpaying qualified electors who vote at the election to carry the proposition. State *ex rel.* Lanier v. Padgett, 19 Fla. 518, text 539, 540; Taylor v. Taylor, 10 Minn. 107; Vance v. Austell, 45 Ark. 400; Taylor v. McFadden, 84 Iowa, 262, 50 N. W. Rep. 1070; Citizens and Taxpayers of DeSoto Parish v. Williams, 49 La. Ann. 422, 21 South. Rep. 647; St. Joseph Township v. Rogers, 16 Wall. 644; County of Cass v. Johnston, 95 U. S. 360; Douglass v. County of Pike, 101 U. S. 677; Carrol County v. Smith, 111 U. S. 556, 4 Sup. Ct. Rep. 539; Knox County v. Ninth Nat.

Bank, 147 U. S. 91, 13 Sup. Ct. Rep. 267; McCrary on Elections, §208; 10 Am. & Eng. Ency. Law (2nd Ed.), 754. Our constitution by requiring as a pre-requisite to the levy of a district school tax that a majority of the qualified electors thereof that pay a tax on real or personal property shall vote in favor of such levy, evidently contemplates that the question is to be submitted at an election and it neither provides nor directs the legislature to provide for ascertaining the precise number of qualified electors authorized to vote at said election as a basis for estimating the majority required. The rule at common law is that where the electoral body is indefinite, the majority is estimated upon the basis of the total number of votes cast, and not upon the basis of the number of votes which might lawfully have been cast if the persons entitled to vote had chosen to attend and vote. This general rule is expressly recognized in various other clauses of the constitution, as will be seen by reference to provisions found in Article XXII, sections 1 and 2; Article XIX, section 1; Ordinance No. 1, and Ordinance No. 11, section 2. If it had been intended to imperatively require a different rule by the provision under consideration, and to repeal the common law rule upon the subject it is reasonable to suppose that the constitution would have made provision for ascertaining the precise number of the electoral body or required the legislature to do so, as a basis for estimating the majority. While other provisions of the constitution require the legislature to provide for the registration of all the legally qualified voters in each county, there is no requirement for registration of qualified electors who pay taxes on real or personal property. The provision of the constitution under consideration either means to leave the common law rule above stated in force or to

leave it to the legislature to provide some method of ascertaining the whole number, the "majority" of which is required. In either event the requisite majority must in this case be ascertained by reference to the total vote cast at the election, for the common law rule and the statutes regulating this election both require it to be ascertained in that manner. For discussion of a somewhat similar question, see the opinion of Brewer, J., in County Seat of Linn County, 15 Kan. 500. While we do not mean to approve all that was said in that opinion, yet the discussion, read in connection with the other cases cited in this opinion, adds force to the view we express upon the question.

We are of opinion that the court erred in refusing to dissolve the injunction. This conclusion renders it immaterial to determine whether the injunction was properly granted in the first instance.

The order refusing to dissolve the injunction is reversed, the temporary injunction is dissolved, and the cause remanded for further proceedings.

[A dissenting opinion was filed by TAYLOR, C. J., and will be found reported on page 634.]